UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |
| _____/ | |
| VITAL PHARMACEUTICALS, INC., *et al.* | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 23-01051 (PDR) |
| JOHN H. OWOC and MEGAN E. OWOC, | |
| Defendants. | |
| _____/ | |

**MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to the above-captioned adversary proceeding (this "Adversary Proceeding") under Rules 7001 and 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Debtor Vital Pharmaceuticals, Inc., and its affiliated debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (the "Debtors," "Plaintiffs," or the "Company"), respectfully bring this motion (this "Motion") requesting that this Court enter an order granting summary

---

[1] The Debtors include (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc.; (iii) JHO Intellectual Property Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicorn Bev LLC; and (vii) Vital Pharmaceuticals International Sales, Inc.  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

12040630-1

judgment in favor of the Debtors on Count I and Count II of the Debtors' *Adversary Complaint for Declaratory Judgment and Turnover of Estate Property* [ECF No. 1] (the "Complaint"), and granting such other and further relief as is just and proper. As grounds for the relief requested in this Motion, the Debtors rely on the *Declaration of John C. DiDonato in Support of Debtors' Motion for Summary Judgment and Incorporated Memorandum of Law* (the "DiDonato Declaration") filed concurrently herewith. The Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The Debtors commenced the Adversary Proceeding pursuant to sections 542(a) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 7001(1), 7001(2), and 7001(9).

2. The Court has jurisdiction over the Adversary Proceeding under 28 U.S.C. §§ 157 and 1334. The Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) because it arises under the Bankruptcy Code and arises in a case under the Bankruptcy Code.

3. Venue of the Chapter 11 Cases and the Adversary Proceeding, as well as adjudication of this Motion, is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. In accordance with Bankruptcy Rule 7008(a), Plaintiffs consent to the entry of a final order or judgment on this Motion by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## PRELIMINARY STATEMENT

5. The Debtors rely on social media to market their products and provide messaging about the business to their customers and followers. However, Defendants have failed to turn over control and access to certain of the Debtors' social media accounts despite the fact that Defendants are no longer employed by the Company. This adversary proceeding seeks a

declaration that the disputed accounts are Company property, and an order requiring that Defendants turn over access and control to the disputed accounts.

6. The disputed accounts are the Instagram and TikTok accounts bearing the handle @bangenergy.ceo (respectively, the "CEO Instagram Account" and the "CEO TikTok Account") and the Twitter account bearing the handle @BangEnergyCEO (the "CEO Twitter Account" and together with the CEO Instagram Account and the CEO TikTok Account, the "CEO Accounts"). All three CEO Accounts were created by company personnel, in their capacity as company employees, and have consistently been used for business purposes. Accordingly, they are owned by the Company, and Defendants should turnover access of the accounts to the Debtors.

## STATEMENT OF UNDISPUTED FACTS

### A. The Debtors' Social Media Assets

7. Since as early as 2010, the Debtors have made strategic use of a variety of non-traditional marketing channels, including marketing directly to customers through various social media platforms. DiDonato Decl. ¶ 5. As of the Petition Date, the Debtors created and operated a number of social media accounts as part of their marketing efforts. *Id.* Both pre- and post-petition, the Company's marketing department created content that was posted across their various social media accounts in a regular and coordinated fashion. *See id.* ¶ 7.

8. The CEO Accounts were among the accounts created by the Company's marketing department and for which the Company's marketing department curated and posted content for purposes of promotion of the Debtors' products and business. *Id.* The CEO Instagram Account is a verified account created in April 2012 with over 1 million followers and more than 6400 posts, the vast majority of which promote the Debtors' products and business. *Id.* ¶ 7. Similarly, the CEO TikTok Account was created in 2019 and has over 850,000 followers, with content primarily focused on promoting the Debtors' products and business. *Id.* And the CEO Twitter Account,

3

created in 2010, has over 7,000 followers, with content primarily focused on promoting the Debtors' products and business. *Id.*

9. During depositions in an unrelated matter, Defendants testified that the CEO Accounts were created and operated by the Company, and the Company's marketing department created videos which were then posted to the CEO Accounts. *Id.* at Ex. C, 84:10-16, 84:22-85:1-6, 86:2-20; *id.* at Ex. D, 22:17-19. All three CEO Accounts cross-reference each other's content. *Id.* ¶ 7.

10. Only a few employees of the Company, including Defendants, had direct access to the CEO Accounts, including knowledge of the login credentials and the ability to post content. *See id.* ¶ 8.

11. The Company's employee handbook (the "Employee Handbook") specifies that

> all ideas, potential marketing (graphic designs, artwork drawings, photography, magazines, pamphlets, packaging, etc.) and sales relationships, inventions, research, plans for products or services, marketing plans, computer software (including, without limitation, source code and object code), computer programs, original works of authorship, characters, processes, trade secrets, information, data, developments, discoveries, improvements, modifications, technology, algorithms and designs, whether or not subject to patent or copyright protection, made, conceived, expressed, developed, or actually or constructively reduced to practice by you solely or jointly with others in connection with or relating to any work performed by you for the company. All of [the foregoing] shall be considered as "work made for hire" belonging to Bang Energy.

*Id.* ¶ 11, Ex. J, at 30.

**B.     The Chapter 11 Cases**

12. On October 10, 2022 (the Petition Date), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered.

13. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108, 11 U.S.C. §§ 1107, 1108.

14. On November 1, 2022, the Office of the United States Trustee (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") [ECF No. 245]. On November 23, 2022, the U.S. Trustee reconstituted the Committee [ECF No. 400]. No request has been made to the Court to order the appointment of a trustee or examiner.

15. On January 12, 2023, the Court entered a final order (the "Final DIP Order") [ECF No. 638] authorizing the Debtors to obtain postpetition financing under the *Superpriority Secured Debtor-in-Possession Credit Agreement* (the "DIP Agreement"). To avoid an event of default under the DIP Agreement, the Debtors are required to achieve certain milestones (the "DIP Milestones"),[2] including, among other things, filing a motion to approve a stalking horse bidder on or before March 24, 2023, holding an auction, if necessary, on or before April 27, 2023, and closing a sale of all or substantially all of the Debtors' assets on or before May 17, 2023. *See* Final DIP Order ¶ 46; Final DIP Order, Ex. B (DIP Agreement) § 5.18. The maturity date of the DIP financing under the DIP Agreement is May 24, 2023 (the "DIP Maturity Date").

16. On February 24, 2023, the Court entered an order (the "Bid Procedures Order") [ECF No. 854] approving bidding procedures for the sale of all or substantially all of the Debtors' assets upon the conclusion of the Debtors' marketing and sale process. The Bid Procedures Order implements a process timeline consistent with the DIP Milestones.

17. In order to preserve and maximize the value of the bankruptcy estate, the Debtors continue to operate, including their market efforts, in the ordinary course.

C.    **The Board's Termination of Mr. and Mrs. Owoc**

18. Defendant Jack Owoc is the Company's founder and former Chief Executive Officer and Chief Science Office. DiDonato Decl. ¶ 15, Ex. E. Defendant Meg Owoc, working

---

[2] The Debtors are engaged in negotiations with the DIP Lenders to modify certain of the Milestones.

5

12040630-1

under various job titles, directed the Debtors' marketing department from 2010 until March 9, 2023. *Id.* ¶ 15, Ex. F.

19. On March 9, 2023, the Debtors' boards of directors and managers (collectively, the "Board") voted to terminate the employment of Mr. Jack Owoc and Mrs. Meg Liz Owoc, and to remove Mr. Owoc from the Board for cause. Following Mr. Owoc's termination, Mr. John DiDonato of Huron Consulting, who had been serving as the Debtors' Chief Transformation Officer, was named by the Board as the Debtors' Interim Chief Executive Officer. *See id.* ¶ 1.

20. The Company promptly notified Defendants and their individual counsel of the Board's decision to terminate their employment. *See id.* ¶ 9, Ex. G and H. As part of those notices, the Company directed Defendants to immediately return all of the Debtors' property, including, among other items, any access codes or devices, mobile phones, computers, and any other property and information. *Id.*

21. Given the management transition, the Company and its advisors worked to secure all estate property, including access to the Company's social media accounts. *Id.* ¶ 10. While the Debtors were able to secure a majority of the social media accounts and changed login credentials and points of contact, they were unable to obtain the current login credentials to the three CEO Accounts. *Id.* On March 10, 2023, the Company sent a letter to counsel for Defendants reiterating the need that they promptly return all Company property and demanding that they reveal the login credentials to the CEO Instagram Account. *Id.* ¶ 11, Ex. I.

22. Also on March 10, 2023, Jack Owoc sent a company-wide email referring to Defendants' termination the day before as a "hostile takeover" and asserting the Company's advisors were lying to all Company employees. *See id.* ¶ 14, Ex. J.

23. On March 16, 2023, Defendants conceded they have knowledge of the login credentials to the CEO Accounts and agreed to provide them under seal to the Court and agreed not to change the passwords during the pendency of this dispute. *See* Order Approving Stipulation Regarding Debtors' Motion for Temporary Restraining Order ("TRO Stipulation") [Dkt. 10], at ¶ 6.[3]  In the TRO Stipulation, Defendants also temporarily agreed to refrain from posting independent content to the CEO Accounts, and agreed to post marketing content at the Debtors' request. TRO Stip. ¶¶ 2-4.

24. Regardless of the agreed upon and so-ordered TRO Stipulation, Defendants failed to provide the Court with the login credentials. After numerous attempts to engage with the Defendants as to whether they intended to provide the Court with login credentials and negotiate in good faith a summary judgment briefing schedule, the Debtors received no response and were forced to bring an emergency motion seeking an order holding Defendants in contempt, among other relief. *See* Dkt. 13 (the "Contempt Motion"). Shortly before the hearing on the Debtors' Contempt Motion, Defendants' counsel confirmed submission of the login credentials for two of the three CEO Accounts to the Court,[4] and also informed Debtors' counsel that he would be withdrawing as counsel for Defendants. Replacement counsel attended the Contempt Motion hearing on March 23, 2023, and on March 24, 2023, replacement counsel informed Debtors' counsel that they would no longer be representing Defendants.

25. The Company is concerned that if Defendants retain control of the CEO Accounts, Defendants might post content that is harmful to the Debtors, their business, their product

---

[3]  The Company continues to assess the extent to which Mr. Owoc or Mrs. Owoc may be in possession of Company property. The Company reserves the right to take additional appropriate action with regard to any additional Company property that Mr. Owoc or Mrs. Owoc have retained and refuse to return.

[4]  Counsel represented that Defendants were unable to locate the password for the CEO TikTok account.

marketing, and/or their bankruptcy sale process. *See* DiDonato Decl. ¶ 14. The Company is also concerned that bidders may view any disruption to the Debtors' marketing efforts negatively, and that in turn it would result in substantially lower bids for the Debtors' assets or the decision not to bid for the assets at all. *See id.* ¶¶ 12-13.

## LEGAL STANDARD

26. Summary judgment is appropriate "if the movant shows no genuine issues of material fact exists, and that it is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding that summary judgment is a favored procedure). "An issue of fact is 'material' if it might affect the outcome of the case under the governing law[, and] it is 'genuine' if the evidence could lead a reasonable jury to find for the non-moving party." *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1375 (S.D. Fla. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

27. The existence of some factual dispute will not defeat summary judgment; rather, the requirement is that no *genuine* issue of *material* fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added); *Celotex Corp.*, 477 U.S. at 327 (holding that when a movant's evidence demonstrates the lack of a genuine issue, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial).

## ARGUMENT

**I. DEFENDANTS MUST TURN OVER ACCESS AND EXCLUSIVE CONTROL OF THE CEO ACCOUNTS TO THE DEBTORS**

28. Section 542(a) of the Bankruptcy Code "authorizes a bankruptcy court to order turnover of the debtor's property held by others." *In re Empire for Him, Inc.*, 1 F.3d 1156, 1160 (11th Cir. 1993). To successfully move for turnover of estate property, a debtor must prove by a

preponderance of the evidence "that the subject property constitutes property of the estate and that the defendant is in possession of that property." *In re Rogove*, 443 B.R. 182, 186 (Bankr. S.D. Fla. 2010). If the property at issue is determined to be property of the bankruptcy estate it must be turned over. *In re Chesley*, 550 B.R. 903, 910 (Bankr. M.D. Fla. 2016) (granting trustee's motion for summary judgment in Section 542 turnover action).

### A. The CEO Accounts Are Property of the Debtors' Estates

29. Under the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As in other circuits, the Eleventh Circuit holds that the "scope of [section] 541(a)(1) is broad, and includes property of all types, tangible and intangible." *In re Meehan*, 102 F.3d 1209, 1210 (11th Cir. 1997).

30. Social media accounts are property of a debtor's estate when the content of the accounts is associated with the debtor's business and use of the accounts is "clearly to generate revenues for the company." *See In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D. Tex. 2015); *see also ME Tech., Inc. v. Brownstein*, No. 20-cv-61508, 2020 LEXIS 215907, at *1 (S.D. Fla. Nov. 13, 2020) (recognizing property interest in social media accounts); *JLM Couture*, 2023 LEXIS 42962, at *34-*35 ("intangible property such as websites and account information can be the object of conversion" in the course of enjoining ex-employees and contractors to return social media accounts).

31. *CTLI, LLC* is particularly instructive. There, the bankruptcy court found that a Facebook page and a Twitter account were business accounts belonging to the debtor, not the debtor's founder. In reaching its conclusion, the bankruptcy court noted that the accounts' names were related to the business, the accounts were directly linked to the debtor's business website, much of the posted content was expressly business-related and promoted the business, and other

debtor employees had access to the accounts. *Id.* at 366-74. In addition, the bankruptcy court rejected arguments that the Facebook account was the founder's personal property because it also included personal content, a fact "utterly insufficient to overcome the presumption that that the Facebook Page . . . was anything other than what it appeared to be: a business Facebook Page for the business." *Id.* at 368.

32. Like the Facebook and Twitter accounts at issue in *CTLI, LLC*, the CEO Accounts at issue here are property of Debtors' estates and not personal property of Defendants. Bang Energy is the brand name of Debtors' major product line of energy drinks. *See* DiDonato Decl. ¶ 6; *see also JLM Couture*, 2023 LEXIS 42962, at *40-*41 ("use of the business or entity name to identify an account to the public weighs heavily in favor of finding the account is owned by the entity rather than by the individual"). The Debtors print the @BangEnergy.CEO handle on the label of their retail cans, encouraging consumers to follow the CEO Accounts to obtain Company information. *See* DiDonato Decl. ¶ 6. The CEO Accounts also include links to the Company's website for the express purpose of promoting the sale of the Company's products. *Id.* ¶ 7. Furthermore, Defendants have each testified that the CEO Accounts, and the content posted to those accounts, were created and controlled by company employees. *Id.* ¶ 7, Exs. A and B. The fact that Defendants may also have posted some personal content does not change the business nature of the CEO Accounts. *See In re CTLI, LLC*, 528 B.R. at 368.[5]

33. In addition, the Company's Employee Handbook specifies that all marketing materials created by any employee and "relating to any work performed by you for the company" "shall be considered as 'work made for hire' belonging to Bang Energy." DiDonato Decl. ¶ 11, Ex. J, at 30; *see also* 17 U.S.C. § 101 ("work made for hire" is "work prepared by an employee

---

[5] For the avoidance of doubt, the Debtors are prepared to remove any content from the CEO Accounts that is unrelated to the Debtors' business and which Defendants contend is solely personal in nature.

within the scope of his or her employment"). "In the case of a 'work made for hire,' the owner of the work is the entity for whom the work was prepared 'unless the parties have expressly agreed otherwise in a written instrument signed by them.'" *In re TLFO, LLC*, 572 B.R. 391, 436-38 (Bankr. S.D. Fla. 2016) (citing 17 U.S.C. § 201(b)). The Defendants worked as employees of the Debtors throughout the life of the CEO Accounts. *See* DiDonato Decl. ¶¶ 6, 7, 8. The content posted to the CEO Accounts that relates to the Debtors' business was prepared and posted for the Debtors to promote the Debtors' products. *Id.* ¶¶ 5-7, 12. There is no express written agreement that the CEO Accounts or any content posted thereon are owned by anyone other than the "entity for whom the work was prepared"—that is, the Debtors.

   **B.** **The CEO Accounts Are in Defendants' Possession**

  34. Historically, access to the CEO Accounts has been maintained by a limited number of individuals, including Defendants. *See* DiDonato Decl. ¶ 8. Following termination of Defendants from their respective positions at the Company on March 9, the Debtors tried to secure all of the Company's social media accounts, but have been unable to obtain access to the CEO Accounts. *Id.* Defendants demonstrated that they (wrongfully) controlled access to the CEO Accounts when they were able to turn over passwords associated with certain of the accounts to the Court on March 23, 2023.

  35. Because there is no genuine dispute of material fact that (1) the CEO Accounts are property of the Debtors' estates, and (2) the CEO Accounts are in Defendants' possession, the Debtors are entitled to summary judgment as a matter of law. *See In re Chesley*, 550 B.R. at 910.

**II.** **A DECLARATORY JUDGMENT THAT THE DEBTORS ARE ENTITLED TO CONTROL THE CEO ACCOUNTS IS WARRANTED**

  36. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Additionally, "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* "An actual controversy exists where there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Laboss Transp. Servs. V. Global Liberty Ins. Co.*, 208 F. Supp. 3d 1268, 1280 (S.D. Fla. 2016) (quotations omitted) (granting summary judgment on declaratory judgment claim). That is, declaratory judgment is appropriate when there is a "substantial likelihood that [plaintiff] will suffer injury in the future." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1211 (11th Cir. 2019). "The granting of relief by declaratory judgment is a matter within the sound discretion of the court." *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1294 (S.D. Fla. 2011) (quoting *Emory v. Peeler*, 756 F.2d 1547, 1551-52 (11th Cir. 1985))

37. As explained above, the CEO Accounts are property of the Debtors' estates. The Debtors have made repeated efforts to obtain access information to the CEO Accounts from the Defendants, but Defendants have thus far refused. DiDonato Decl. ¶¶ 9, 11. Lack of access to the CEO Accounts imposes an imminent, substantial likelihood of injury on the Debtors, warranting a declaration that they are entitled to control over the CEO Accounts.

38. *First*, the Debtors would face a competitive injury without "exclusive access and control" to critical social media accounts. *See JLM Couture, Inc. v. Hayley Paige Gutman*, No. 20-cv-0575, 2023 LEXIS 42962, at *60 (S.D.N.Y. Mar. 14, 2023) (holding that lack of access to social media accounts used to advertise business would be injurious to the company). In *JLM Couture*, the court found a likelihood of injury when a company could not access social media

accounts historically used to promote its business because the accounts at issue "serve[d] as powerful advertising platforms through which JLM displays and identifies its products…and capture[d] the interest of both potential and actual customers." *Id.* The court further noted that the social media accounts were "inextricably linked" to the brand because "followers are directed to [the Company's] websites" and the "handles are used to identify [the Company's] physical goods." *Id.* at *61.

39. Like *JLM Couture*, the Company needs control of the CEO Accounts because they are especially significant to the Company's business. The Company's success is directly correlated to the intensive marketing strategy using digital marketing, including the CEO Accounts, to promote the Company's brand and products to millions of followers. *See* DiDonato Decl. ¶¶ 5-7. The continued success of the Company's marketing efforts, and the sale of the Company's products, relies on the CEO Accounts as part of that overall strategy. *Id.* The CEO Instagram Account alone has over 1 million followers, and the Company needs to be able to continue marketing and communicating with those followers, especially during this time of management transition and sale process. *Id.* Also like *JLM Couture*, the CEO Accounts direct followers to the Debtors' website, and the CEO Account handles are branded on the Debtors' highest retailing product. *Id.* ¶¶ 6-7. Absent "control over the Accounts that it owns, [the Company] will suffer irreparable harm because it will lose one of its primary methods for communicating directly and easily with potential and actual customers." *JLM Couture*, 2023 LEXIS 42962 at *62.

40. *Second*, the Debtors are at a critical juncture in their Chapter 11 Cases. DiDonato Decl. ¶ 14. The Debtors are seeking to designate a stalking horse bidder in a matter of weeks. *Id.* Per the schedule set by this Court, Debtors will solicit qualified, binding bids not long thereafter,

and consummate a sale before the DIP Maturity Date. *Id.* It is imperative that the Debtors secure the CEO Accounts in order to continue normal business and marketing operations, and to maximize estate value in advance of a bankruptcy sale. *Id.* If there is disruption to the Debtors' normal business and marketing operations, potential bidders could become concerned resulting in substantially lower bids for the Debtors' assets or decide not to bit for the assets at all. *Id.*

41. *Third*, not only is access to the CEO Accounts a marketing tool used to promote sales, but also because the CEO Accounts can be used to reach millions of the Debtors' customers, content posted to the CEO Accounts that is harmful to the Debtors could have a detrimental impact. Immediately following Mr. Owoc's termination, he sent a company-wide email with the apparent goal to convince Company employees to not trust the Company's advisors and criticizing current management. *Id.* ¶ 14. The Debtors, therefore, have legitimate concerns that Defendants may post content that is intended to harm or (intended or not) is otherwise harmful to the Debtors and their business, which would be transmitted widely.

42. Thus, lack of access to the CEO Accounts imposes a significant likelihood of injury, and Defendants retaining exclusive control of the accounts increases the likelihood of injury even further. Accordingly, the Court should enter summary judgment declaring the Debtors are entitled to control the CEO Accounts.

## CONCLUSION

43. For all the foregoing reasons, Plaintiffs respectfully request that the Court enter summary judgment, declare that the CEO Accounts are property of the Debtors' estates, and order Defendants to turn over the CEO Accounts, including all login credentials needed to access and secure them.

[Remainder of page intentionally left blank.]

| | |
|---|---|
| Dated:  March 31, 2023<br>Miami, Florida | Respectfully submitted,<br><br>*/s/ Jordi Guso*<br>Jordi Guso<br>Florida Bar No. 863580<br>Michael J. Niles<br>Florida Bar No. 107203<br>**BERGER SINGERMAN LLP**<br>1450 Brickell Avenue, Suite 1900<br>Miami, FL 33131<br>Telephone:  (305) 755-9500<br>Email:  jguso@bergersingerman.com<br>           mniles@bergersingerman.com |

George A. Davis (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
           hugh.murtagh@lw.com
           tj.li@lw.com
           brian.rosen@lw.com
           jon.weichselbaum@lw.com

- and -

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

*Co-Counsel for the Plaintiffs/Debtors*

12040630-1