UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,[1]

    Debtors.
_____/

VITAL PHARMACEUTICALS, INC., *et al.*,

    Plaintiffs,

v.

JOHN H. OWOC AND MEGAN E. OWOC,

    Defendants.
_____/

Case No.: 22-17842-PDR

Chapter 11
(Jointly Administered)

Adv. Proc. No. 23-01051-PDR

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

John H. Owoc aka Jack Owoc ("Mr. Owoc") and Megan E. Owoc ("Mrs. Owoc"), pursuant to Fed. R. Civ. P. 56, respond in opposition to the *Motion for Summary Judgment* (the "Motion") filed by Vital Pharmaceuticals, Inc. and its affiliated debtors in these jointly administered cases (together, the "Debtors"). ECF No. 20. In support of their response Mr. and Mrs. Owoc (together, the "Owocs") state:

### SUMMARY OF ARGUMENT

Ownership disputes over social media accounts constitute a cutting edge area of the law.

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

Few courts have addressed the issue, especially in a bankruptcy context, and there appears to be no bright line test or other precedent binding on this Court on how to determine the ownership of a disputed account.  It is apparent, however, that an ownership inquiry must be <u>fact intensive</u> one, focusing on the unique circumstances of each case.  These circumstances include the *persona* of the individual account holder, the historical use and content of the account, and the terms and conditions of the social media platform that the user agreed to in creating the account.

The Motion ignores these principles.  Through it, the Debtors are attempting to shoehorn a complex fact pattern, involving individuals who maintain public personas on social media, and accounts with both individual and business postings, into a simplistic narrative of corporate ownership rather than a holistic inquiry.  Summary judgment is not appropriate, especially given that the Owocs have not had an opportunity to conduct adequate discovery in the case.  The Court should deny the Motion.

**FACTUAL BACKGROUND**

A.  **The Jack Owoc Persona.**

1. Mr. Owoc is the founder of the Debtors, and until recently served as their Chief Executive Officer and Chief Science Officer.  J. Owoc Decl. ¶¶ 1–2.[2]

2. Throughout his life, Mr. Owoc has been an avid fitness trainer, designer and producer of fitness supplements, weight-lifter, motivational speaker and writer.  He has conceptualized, created and brought to market numerous energy drinks and fitness supplements.  *Id.* at ¶ 4–5.

3. As a result of these endeavors, Mr. Owoc has created a very colorful, public persona.  His individual persona, his brand, is distinct from and has personal value apart from the

---

[2]  "J. Owoc Decl." refers to the declaration of Mr. Owoc being filed contemporaneously herewith. "M. Owoc Decl." refers to the declaration of Mrs. Owoc being filed contemporaneously herewith.

{2467/000/00553587}

Debtors.  J. Owoc Decl. at ¶¶ 7–8; M. Owoc Decl. ¶¶ 5–7.

4. Due to the value of this persona, when the Owocs decided to incorporate social media to market the Debtors' products, they deliberately created their own personal, individual social media accounts that were segregated from the assortment of the Debtors' social media accounts and treated differently.  J. Owoc Decl. at ¶ 9; M. Owoc Decl. ¶ 8.

**B.     The Disputed Accounts.**

5. Through the Motion, the Debtors seek summary judgment regarding the ownership of three accounts: an Instagram and TikTok account each bearing the handle @bangenergy.ceo, and a Twitter account bearing the handle @BangEnergyCEO (each an "<u>Account</u>" and together, the "<u>Accounts</u>").

6. The Debtors hold approximately 52 corporate social media accounts, consisting of over twenty Instagram accounts, eight TikTok accounts, five Twitter accounts and over nineteen Facebook accounts.  J. Owoc Decl. at ¶ 20.  These are business accounts that are used for business purposes.  By contrast, the Accounts are personal accounts segregated from the larger assortment of the Debtors' social media accounts, as stated in ¶ 4 *supra*.

7. The handles of the Accounts, which incorporate the term "bangenergyceo," are a double entendre.  They reference the former position of Mr. Owoc as an officer of the Debtors, but also reference his individual persona and personality as a high-intensity, energetic leader—a Bang Energy CEO.  J. Owoc Decl. at ¶ 12; M. Owoc Decl. at ¶ 12.

8. Given this reference to Mr. Owoc's individual persona, the Owocs conceived of the handles of the accounts to refer to and complement the Jack Owoc persona.  J. Owoc Decl. at ¶¶ 12–13.  The Owocs essentially had exclusive possession, custody or control over the Accounts, with: (a) Mrs. Owoc personally creating the Instagram and Twitter accounts, (b) the Debtors never

requesting or having possession of the passwords of the Accounts, and (c) Mr. Owoc having full, complete and unilateral discretion over the content posted to the Accounts. *Id.* at ¶¶ 11–26. Moreover, the substantial majority of the content on the Accounts was of a personal nature, not relating to the Debtors' businesses. *Id.* at ¶ 27. For example:

- Of the 99 postings made to the Instagram account between November 17, 2022 and April 10, 2023, roughly 58, i.e. 59%, are clearly personal and reflective of the Jack Owoc persona and not the Debtors. *Id.* at ¶¶ 28–29.

- Of the 146 postings made to the TikTok account between January 1, 2022 and April 10, 2023, roughly 80, or 55%, are clearly personal and reflective of the Jack Owoc persona and not the Debtors. *Id.* at ¶¶ 30–31.

- Of the 39 postings made to the Twitter account between November 17, 2020 and April 10, 2023, approximately 32, i.e. 82%, are clearly personal and reflective of the Jack Owoc persona and not the Debtors. *Id.* at ¶¶ 32–33.

9. The declaration of Mr. Owoc being filed contemporaneously herewith includes samples of these personal postings, such as family pictures of the Owocs, Mr. Owoc weight training, the birth of one of the Owocs' daughters, and Mr. Owoc playing drums. *Id.* at ¶¶ 27–33.

10. Simply put, the Accounts are property of the Owocs and not the Debtors.

C. **The Motion.**

11. The Debtors filed the Motion on March 31, 2023, seeking summary judgment on: (a) a declaratory judgment count that they are entitled to control over the Accounts, and (b) a turnover count seeking turnover of the Accounts and their passwords. *See generally* Mot.

12. It is difficult to overstate the ways in which the Motion is flawed. For example, rather than focus on the heart of this adversary proceeding—the historical control and content of the Accounts—the bulk of the Motion focuses on tangential issues such as the termination of the Owocs from the Debtors. *Compare* Mot. ¶¶ 1–5 (five paragraphs addressing ownership of Accounts) *with* ¶¶ 6–19 (thirteen paragraphs reciting procedural history of bankruptcy cases and Owocs' termination). The Debtors' declare in a blanket, hand waving fashion, that the "vast

{2467/000/00553587}

4

majority" of posts on the Instagram account promotes their business, and that content on the TikTok and Facebook "primarily" focuses on promoting their products, without substantiating those claims. *See* DiDonato Decl. ¶¶ 6–7.[3] As a final example, the declaration of the Chief Transformation Officer of the Debtors, John DiDonato, as based not only on his personal knowledge, but on "discussions with members of the Debtors' management, the Chief Transformation Officer's teams [and] the Debtors' other advisors[.]" Put another way, the Owocs have no ability to determine what parts the DiDonato declaration actually reflect the personal knowledge of Mr. DiDonato, and what parts constitute inadmissible hearsay.

13. The Court should deny the Motion.

## LEGAL STANDARD

"Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Sosa v. Carnival Corp.*, 423 F.Supp.3d 1336, 1338 (S.D. Fla. 2018) (citing Fed. R. Civ. P. 56(a) and (c)). "If there are any factual issues, summary judgment must be denied and the case proceeds to trial." *Sosa*, 423 F.Supp. at 1338 (citation omitted). "Even when the parties agree on basic facts, but disagree about the inferences that should be drawn from those facts, summary judgment may be inappropriate." *Sosa*, 423 F.Supp. at 1338 (quotation omitted). Finally, "[i]n considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inference in the light most favorable to the non-moving party." *In re Cario,* 2012 WL 1122887, at *3 (Bankr. S.D. Fla., Apr. 3, 2012) (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).

---

[3] "DiDonato Decl." refers to the Declaration of John C. DiDonato filed by the Debtors at ECF No. 21.

# ARGUMENT

I. **THE ACCOUNTS ARE NOT PROPERTY OF THE ESTATES.**

The Complaint again asserts two counts against the Owocs: declaratory judgment that the Debtors are entitled to control over the Accounts (Count I), and turnover (Count II). Each of these counts is predicated on a finding that the Accounts constitute property of the Debtors' estates. *See, e.g.*, Mot. ¶¶ 28 ("To successfully move for turnover of estate property, a debtor must prove by a preponderance of the evidence that the subject property constitutes property of the estate and that the defendant is in possession of that property.") (quotation omitted) and 37 (arguing in declaratory judgment context that the Accounts "are property of the Debtors' estates.").

    A.    **The Debtors' Failed Effort to Establish a Bright Line Ownership Test.**

As stated *supra*, case law regarding disputed social media accounts, especially in a bankruptcy context, is scarce. Unsurprisingly, the Debtors are able to cite only two cases, neither of which is binding on this Court, in support of their ownership claims: *In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015), and *JLM Couture, Inc. v. Gutman*, 2021 WL 827749 (Bankr. S.D.N.Y. Mar. 4, 2021), *aff'd in part, vacated in part and remanded*, 24 F.4th 785 (2d Cir. 2022). Building on this slender foundation, the Debtors make the blanket statement that "[s]ocial media accounts are property of a debtor's estate when the content of the accounts is associated with the debtor's business and use of the accounts is clearly to generate revenues for the company." Mot. ¶ 30 (citations and quotation omitted).

The reality is far more complicated. While not without value, both *CTLI* and *JLM* are distinguishable from the current proceeding and do not establish a bright line test for determining social media account ownership.

In *CTLI*, the principal of a corporate debtor, CTLI, LLC dba Tactical Firearms, created a

Facebook Page for the debtor titled "Tactical Firearms." 528 B.R. at 367. Under Facebook procedures, the type of Page created was for "businesses, brands and organizations," and not "individual people." *Id.* at 367 (footnote omitted). The posts on the Page "were expressly business-related." *Id.* at 368. While the principal did post certain content to the Page referencing himself as an individual, the court found that these 'personal' posts—which involved attendance at a firearms exposition and political opinions concerning gun control—were ultimately subordinate to the business interests of Tactical Firms in selling guns. *See CTLI*, 528 B.R. at 371 ("…this Court finds that all of these political posts and Tweets are related to the Debtor's business and were issued with the purpose of generating publicity for the business in order to increase gun sales and ammunition."). Similarly, the principal created a Twitter account titled "Tactical Firearms" with the Twitter handle @tacticalfirearm. *CTLI*, 528 B.R. at 372. The Debtor provided only one example of a personal tweet on the account, which the court likewise determined to be a *de facto* business post. *Id.* Based on these and other factors, and after considering evidence over two days of evidentiary hearings, the court determined that the accounts were property of the debtor and not its principal. *See CTLI*, 528 B.R. at 363 and 368.

The differences between this case and *CTLI* are stark. In particular:

- *CTLI* again involved a Facebook Page specifically designed for "businesses, brands and organizations," and not "individual people." No such limitation applies to the Accounts.

- The court in *CTLI* found that the posts on the Facebook Page and Twitter account were expressly business related, and the Debtor could not identify any personal posts. By contrast, the majority of posts on the Accounts are of a personal nature, and concern subjects such as the birth of Mr. Owoc's daughter.

- Nothing in *CTLI* suggests that the principal of the debtor had a public *persona* and personal brand rivaling that of the Owocs.

- The principal in *CTLI* argued that every social media account of the Debtors was in fact his. *See* 528 B.R. at 363. By contrast, the Owocs acknowledge

{2467/000/00553587}

7

- that the Debtors own approximately 52 social media accounts, but not the three segregated, individual Accounts at issue.

- Although *CTLI* was ultimately decided against the principal, the court made this determination after two days of trial. *See id.* The Debtors are attempting to prosecute a far weaker case via a rushed summary judgment process, and without the Owocs being able to take discovery on relevant topics.

The remaining case relied on by the Debtors, *JLM*, is even more dissimilar than *CTLI*. In *JLM*, the plaintiff sued a former employee who designed lines of bridalwear and related merchandise. 2021 WL 827749, at *1. The plaintiff brought breach of contract and other claims, and sought preliminary injunctive relief to bar the defendant *inter alia* from altering the content of various social media accounts without permission. *Id.* The district court granted this request, noting that the employment contract between the parties transferred to the plaintiff the exclusive right to use various names including "'Hailey Page,' or any derivative thereof," and that social media accounts titled "misshaleypaige" and "@misshaleypaige" were derivatives that fell within the scope of the contract. *Id.* at *10. Per the court, those account handles were names to which the defendant had granted the plaintiff exclusive rights. *See JLM*, 2021 WL 827749, at *10.

Notably—and unmentioned by the Debtors—*JLM* was reversed in part on appeal, with the Second Circuit noting that the district court granted the plaintiff control over the disputed social media accounts without addressing "the somewhat more nuanced issue of ownership" of the accounts themselves. *See JLM*, 24 F.4th at 798 (citation omitted). The Second Circuit added that an analysis of the accounts for injunctive relief purposes "sounds in property, not in contract," and there was "no way to salvage" the injunction issued by the district court under its contract-based theories. *See id.* at 799. The appellate court declined to address "the correct framework for answering who owns the [accounts] or what result that framework would dictate," but remanded the matter for further findings. *See id.* at 800.

However, even setting aside its remand after appellate review, *JLM* does not resemble the instant case. *JLM* is again a preliminary injunction order based on a contract that transferred the right to use various names, including social media handles, to the plaintiff. *See* 2021 WL 827749, at *10. No such contract exists here. The Owocs never singed an employee agreement. J. Owoc Decl. ¶¶ 10 and 40(b); M. Owoc Decl. ¶¶ 9 and 31(b). Although the Debtors make much of the fact that the Employee Handbook contains policies regarding the ownership of marketing materials, a handbook is not a contract. "It is well established under Florida law that policy statements contained in employment manuals do not give rise to enforceable contract rights in Florida unless they contain specific language that expresses the parties' explicit mutual agreement that the manual constitutes a separate employment contract." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1273 (11th Cir. 2009) (quotation omitted) (citing cases); *see Quaker Oats Co. v. Jewel*, 818 So.2d 574, 580 (Fla. Fla. 5th DCA 2002) ("Florida courts will continue to adhere to the established rule that an employee's policy manual is not a contract and it may contain all sorts of unenforceable statements of 'policy' calculated to energize employees into a frenzy or production and loyalty.") (Peterson, J., concurring).

    **B.**    **Ownership of the Accounts Must be Determined through a Fact-Intensive Inquiry.**

Given the distinguishing features of *CTLI* and *JLM*, the Court should disregard the Debtors' simplistic rationale that, because the Accounts contain certain business-related posts, they must constitute property of the estate.

The better approach is to instead engage in a fact-intensive inquiry, considering relevant factors such as: (1) the *persona*, or interest of the individual account holder in the exclusive use of his own identity, (2) how the individual account holder uses the account, (3) the account ownership interests established in the terms and conditions of the social media website, and (4) control over

the account.  While again factually distinguishable, *CTLI* considered each of these factors in its analysis of whether Facebook and Twitter accounts constituted property of the estate.  *See* 528 B.R. at 367–72 (analyzing trial evidence).  Certain of the factors have been proposed by third-party commentators.  *See* Alexandra L. Jamel, *Mixing Business With Pleasure: Evaluating the Blurred Line Between the Ownership of Business and Personal Social Media Accounts Under § 541(a)(1)*, 33 Emory Bankr. Dev. J. 561, 583 (2017) ("To determine whether a chapter 11 debtor's social media accounts constitute property of the estate, courts should balance the following three factors: (1) how the individual account holder uses the account; (2) the ownership interests based on the terms and conditions; and (3) whether the social media account at issue has value.").  And the final factor, control, has long been recognized as a critical inquiry into ownership rights when legal title is uncertain or nominally in the hands of another.  *See In re Trujillo*, 626 B.R. 59, 74 (Bankr. S.D. Fla. 2019) ("Florida has no clear standard for determining whether someone is the equitable or beneficial holder of assets…nominally owned by another.  The cases are fact specific…The most critical factor is usually control.") (citations omitted).[4]

The application of these factors makes it clear that the Owocs, and not the Debtors, own the Accounts.  In particular:

- The Owocs have public *personas* and brands separate and apart from the Debtors.

- The Owocs utilize the account for personal reasons, and make posts for individual purposes.

- The Owocs believe that any discovery obtained from Instagram, Facebook and Twitter will confirm their individual ownership of the Accounts.

---

[4]   For the avoidance of doubt, the Debtors do not hold any ownership interest in the Accounts, whether legal or equitable.  The Owocs are citing *Trujillo* simply to demonstrate that control over an asset is often used to determine its actual or beneficial ownership.  In the event the Debtors did hold nominal or legal title to the accounts—which the Owocs again dispute—the Owocs would retain beneficial ownership under the analysis in *Trujillo*.

- The Owocs have historically maintained exclusive control over the Accounts. Mrs. Owoc personally created the Instagram and Twitter accounts. Mr. Owoc maintained exclusive control over what content was posted on the Instagram account. Mr. Owoc also posted, commented through and answered direct messages on his Instagram page on a daily basis. Indeed, when the Debtors' Social Media Manager, Christina Weronik, whose responsibilities include securing and managing all corporate social media passwords, was asked for the passwords to the Accounts, she did not have them.

Summary judgment is not appropriate in light of these facts and the Court should deny the Motion.

**II. SUMMARY JUDGMENT IS PREMATURE.**

Although summary judgment not warranted in any event, *see* § I *supra*, it is particularly inappropriate at this point in time because it is premature.

The Eleventh Circuit has repeatedly cautioned that trial courts "should not grant summary judgment until the non-movant 'has had an adequate opportunity for discovery.'" *Blumel v. Mylander*, 919 F.Supp. 423, 428 (M.D. Fla. 1996) (quoting *Snook v. Trust Co. of Georgia Bank*, 859 F.2d 865, 870 (11th Cir. 1988)) (additional citations omitted). "Indeed, the whole purpose of discovery in a case in which a motion for summary judgment is filed is to give the opposing party an opportunity to discover as many facts as are available and he considers essential to enable him to determine whether he can honestly file opposing affidavits." *Blumel*, 919 F.Supp. at 428 (quotation omitted). "Thus, out of fairness to the non-movant, summary judgment may only be decided upon an adequate record." *Id.* "Once it is convinced discovery is inadequate, the district court should deny summary judgment." *Blumel*, 919 F.Supp. at 428 (citations omitted); *see David v. Kentucky Child Support Agency*, 2021 WL 195202 (M.D. Fla., Jan. 20, 2021) (denying summary judgment motion as premature when it was filed two months after service of complaint); *Live Face on Web, LLC v. Drutman*, 2015 WL 5996937 (M.D. Fla., Oct. 14, 2015) (denying summary judgment motion as premature so that both parties had an adequate opportunity to engage in

discovery).

Summary judgment is grossly premature in this proceeding. The Complaint was filed one month ago, on March 14, 2023. ECF No. 1. The Owocs have not yet filed an answer or other response to it.[5] During the approximately four weeks the complaint has been pending, the Debtors have filed an emergency motion for temporary restraining order and two emergency motions for contempt. ECF Nos. 2, 13 and 28. These filings have resulted in the Court setting hearings on March 16, March 28, and April 12, 2023. ECF Nos. 6, 15 and 30. The May 17, 2023 scheduling conference scheduled in the summons is over one month away. ECF No. 4. The parties have not exchanged Fed. R. Civ. P. 26(a)(1) initial disclosures or otherwise conferred on a scheduling order. It is axiomatic that the Owocs have not had a meaningful opportunity to conduct discovery under these conditions.

Discovery is particularly important in this case given the fact-intensive inquiry the Court must make in order to determine ownership of the Accounts. *See* § I *supra*. In particular, the Owocs require discovery for the following reasons:

- The Owocs have been unable to obtain documents from and depose John C. DiDonato, the Chief Transformation Officer (the "CTO") of the Debtors who made a declaration in support of the Motion. *See* ECF No. 21. This is particularly important because the declaration of the CTO contains inadmissible hearsay. *See* § III *infra*.

- The Owocs have been unable to obtain all copies, editions and drafts of the Employee Handbook. The Debtors attach only four pages of the Handbook as an exhibit to the Motion, and Owocs have no ability to review the complete, current document. *See* ECF No. 21-10.

- The Owocs have been unable to obtain documents from or depose a Fed. R. Civ. P. 30(b)(6) representative of the Debtors knowledgeable to testify about the allegations in the Complaint.

- The CTO declaration states that the Owocs were terminated from their

---

[5] The original deadline to respond to the Complaint was Thursday April 13, 2023. That deadline was extended to Tuesday April 18, 2023 by an agreed motion and order. ECF No. 37.

> positions with Debtors on March 9, 2023, prior to the Complaint being filed. *See* ECF No. 21 at ¶ 8.  The Owocs have had no access to the Debtors' corporate documents, emails and communications since that time, and require discovery from the Debtors for emails and other evidence regarding ownership of the Accounts.

- The Owocs have not been able to obtain discovery from relevant social media entities, including Instagram, TikTok and Twitter, for terms and conditions with account holders and any contracts relevant to the Accounts.

J. Owoc Decl. ¶¶ 37–40; M. Owoc Decl. ¶¶ 29–31.

Given these dynamics, summary judgment is premature.

### III.   PORTIONS OF THE DEBTORS' EVIDENCE ARE INADMISSIBLE AND MISCHARACTERIZED.

Finally, the Court should deny the Motion because it relies on inadmissible and mischaracterized evidence.

#### A.   The DiDonato Declaration is Inadmissible.

Rule 56 permits a party to object to material cited in a summary judgment motion if it not "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Similarly, the rule mandates that declarations used to support a motion "must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]". Fed. R. Civ. P. 56(c)(4).  Given these provisions, it is well established that hearsay generally cannot be considered in a motion for summary judgment.  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and footnote omitted).

Flouting this rule, the DiDonato declaration states that it is made not only upon the personal knowledge of Mr. DiDonato, but "my discussions with members of the Debtors' management, the Chief Transformation Officer's teams, the Debtors' other advisors, my review or relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge." DiDonato Decl. ¶ 3.  Given

this expansive qualification, there is no ability to discern which portions of the DiDonato declaration derive from his personal knowledge, and which constitute laundered hearsay statements of third parties. *See* Fed. R. Evid. 801 and 802 (defining and prohibiting hearsay). For example, the DiDonato declaration states that the Instagram account was "created in April 2012 with over 1 million followers and more than 6400 posts, a vast majority of which promote the Debtors' products and businesses." DiDonato Decl. ¶ 6. How does Mr. DiDonato purport to know this information? Did he personally review over 6,400 posts on the Instagram account that span over the course of a decade? Or did a third party—who has not been identified and who the Owocs have had no opportunity to take discovery from—tell him? The latter scenario involves inadmissible hearsay that should not be considered under Rule 56(c).

Absent resolution of these issues, and a real opportunity for the Owocs to take discovery, the Court should not consider the DiDonato declaration.

B.  **The DiDonato Declaration Misconstrues Evidence.**

In addition to being inadmissible the DiDonato declaration misconstrues its own exhibits. Specifically, Mr. DiDonato characterizes deposition testimony of the Owocs as follows: "In fact, during depositions in an unrelated matter, Jack Owoc and Meg Liz Owoc testified that the accounts were created and primarily operated by the Company. True and correct copies of the relevant excerpts of these deposition transcripts are attached hereto as Exhibits C and D." DiDonato Decl. ¶ 7.

However, the depositions attached to the DiDonato declaration say nothing of the kind. When asked during his deposition if "[s]omebody at Vital" created the Instagram account, Mr. Owoc answered yes. J. Owoc Dep. Tr., p. 84, l. 22–p. 85, 1.[6] This testimony is accurate because

---

[6] "J. Owoc Dep. Tr." Refers to the deposition excerpt of Mr. Owoc filed at ECF No. 21-3.

{2467/000/00553587}
14

Mrs. Owoc personally created the account. *See* ¶ 8. And when asked if he personally posted on social media accounts, Mr. Owoc affirmed that he posted on the Instagram account. J. Owoc Dep. Tr., p. 86, ll. 21–23. Nothing in the deposition excerpt supports the contention made in the DiDonato declaration.

Similarly, the bulk of the deposition excerpt of Mrs. Owoc concerns corporate social media accounts that are not relevant to this adversary proceeding. *See* M. Owoc Dep. Tr., p. 19, l. 16–p. 22, l. 16.[7] In answer to the question, "Does Vital operate the Instagram account @bangenergy.ceo" Mrs. Owoc did answer yes, because Mr. Owoc is the sole shareholder of Vital Pharmaceuticals, Inc., and was at that time Mr. Owoc its Chief Executive Officer and Chief Science Officer. *See id.* at p. 22, ll. 17–19. However, nothing in the deposition excerpt suggests that the Debtors opened or owned the account.

## **CONCLUSION**

In this summary judgment context, the burden lies with the Debtors to demonstrate that there is no genuine issue of material fact (or any interpretation of a material fact), and they are entitled to judgment as a matter of law. As the Owocs have demonstrated, however, determining the ownership of the Accounts will require the Court to apply heavily contested facts, and interpretations of those facts, in a developing area of the law. That dynamic is fatal to the Motion, particularly given: (a) a rushed litigation process, with a one-month old complaint, multiple emergency hearings scheduled at the request of the Debtors, and the Owocs having had no opportunity to obtain discovery, and (b) the inadmissible, mischaracterized, and insufficient evidence proffered by the Debtors.

The Court should deny the Motion.

---

[7] "M. Owoc Dep. Tr." refers to the deposition excerpt of Mrs. Owoc filed at ECF No. 21-4.

{2467/000/00553587}

WHEREFORE, the Owocs respectfully request that the Court: (1) deny the Motion, (2) in the alternative, defer consideration of the Motion until such time as the Owocs have taken adequate discovery; and (3) grant such other relief as the Court deems appropriate.

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by Notice of Electronic Filing via CM/ECF to those parties registered to receive such notice in this case on April 16, 2023.

        **SHRAIBERG PAGE P.A.**
        Attorneys for the Owocs
        2385 NW Executive Center Drive, Suite 300
        Boca Raton, Florida 33431
        Telephone: 561-443-0800
        Facsimile: 561-998-0047
        Email:  bss@slp.law
        Email:  pdorsey@slp.law

        By:  /s/ Bradley Shraiberg
            Bradley Shraiberg
            Fla Bar No. 121622
            Patrick Dorsey
            Fla. Bar No. 0085841