UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

_____/

| | |
|---|---|
| VITAL PHARMACEUTICALS, INC., *et al.* | |
| Plaintiffs, | |
| v. | |
| JOHN H. OWOC and MEGAN E. OWOC, | Adv. Pro. No. 23-01051 (PDR) |
| Defendants. | |

_____/

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

---

[1] The "Debtors" include (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc.; (iii) JHO Intellectual Property Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicorn Bev LLC; and (vii) Vital Pharmaceuticals International Sales, Inc. The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

The Debtors in the above-captioned chapter 11 cases hereby reply to Defendants' *Response to Motion for Summary Judgment* [ECF No. 40] (the "<u>Response</u>") and in further support of their *Motion for Summary Judgment and Incorporated Memorandum of Law* [ECF No. 20] (the "<u>Motion</u>"),[2] and respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.       Defendants concede every legal principle and material fact necessary to adjudicate the claims asserted in the Complaint as a matter of law in Plaintiffs' favor. Defendants concede that turnover and declaratory judgment are appropriate if the Debtors own the CEO Accounts. Defendants also concede that businesses may and do own social media accounts like the CEO Accounts. Defendants also concede that *CTLI* and *JLM* set forth the established legal framework for determining whether the Debtors own the CEO Accounts. Defendants are therefore left to dispute only the application of the *CTLI/JLM* framework to the current facts. But, as explained below, they concede all of the facts material to the analysis.

2.       Defendants' remaining arguments and factual assertions are misdirected. No amount of discovery will undo the existing concessions and admissions; and Defendants agreed that any discovery would be expedited to ensure prompt hearing on the Motion. Defendants chose not to seek any such discovery prior to filing their Response, and still have not done so. Finally, Defendants' complaints regarding the Debtors' evidence are vague and misplaced, and Defendants cannot avoid their own prior testimony on these topics. Defendants may now wish they had not admitted the Debtors owned and operated the CEO Accounts, but that is exactly what they did.

3.       Accordingly, the Court should grant the Motion.

---

[2]   Capitalized terms used but not otherwise defined in this Reply have the meanings given to such terms in the Motion.

## ARGUMENT

I.   ***CTLI*** **AND** ***JLM*** **PROVIDE THE PROPER FRAMEWORK FOR ASSESSING OWNERSHIP OF THE CEO ACCOUNTS.**

4.     Defendants argue that *In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D. Tex. 2015) ("*CTLI*") and *JLM Couture, Inc. v. Gutman*, No. 20 CV 10575, 2023 WL 2503432 (S.D.N.Y. Mar. 14, 2023) ("*JLM*") are distinguishable from the present dispute. *See* Response 6. They are not.

5.     The relevant facts in *CTLI* are strikingly similar to the facts here, including that the accounts bore the business's name, the accounts were directly linked to the debtor's business, the allegedly personal posts to the accounts were plainly promotional, and employees had access to and posted on the account. *See CTLI* at 367-70. In response, Defendants offer five unpersuasive attempts to distinguish *CTLI*:

- ***First***, the fact that *CTLI* involved a "Facebook Page specifically designed for 'businesses, brands and organizations,' and not 'individual people'" is immaterial. *See* Response 7. While the court mentioned the page's business designation, it did so in a parenthetical within a sentence emphasizing that the page's *title*, "Tactical Firearms," "raise[d] a presumption that it was the Debtor's Facebook Page." *See CTLI* at 367. It is this element—the title—that the *JLM* court applied to an *Instagram* account, stating that the account's use of a tradename belonging to the business (JLM) "weigh[ed] heavily in favor of finding" that the business owned the account. *See JLM* at *11.[3]

- ***Second***, Defendants' are wrong that the *CTLI* court concluded all posts "were expressly business related, and the [d]ebtor could not identify any personal posts." Response 7. The court concluded that even posts identified as personal were in fact business related because they were "subtle marketing" designed to promote the business. *CTLI* at 371.

- ***Third***, Defendants contend that "[n]othing in *CTLI* suggests that the principal of the debtor had a public *persona* and personal brand rivaling that of the Owocs." Response 7. But *CTLI* does address personas, and gives them a specific meaning: "the [property] interest of an individual in the exclusive use of his own identity, insofar as it is represented by his name or likeness." *CTLI* at 376 (quoting *Brown v. Ames*, 201 F. 3d 654, 658 (5th Cir. 200)) (emphasis added). The handles of the CEO Accounts do not use Mr. Owoc's name, and the handles do not feature his likeness (and all images

---

[3]  The argument is also misleading: Defendants omit that *CTLI* also concerned a *Twitter* account, which had no structural "business" designation, but which the court still concluded belonged to the company in large part because the account handle bore the name of the business. *Id.* at 372.

containing his likeness could easily be removed from the CEO Accounts). If Mr. Owoc has a persona within the meaning of *CTLI*, it is divorced from the CEO Accounts.[4]

- **Fourth**, Defendants argue that, unlike in *CTLI*, they "acknowledge that the Debtors own approximately 52 social media accounts, but not the three segregated, individual Accounts at issue." Response 7-8. The fact that Defendants do not purport to own certain accounts does not strengthen their assertion that they do own others. If anything, the existence of 52 other social media accounts suggests that the Debtors maintain an inventory of accounts of which the CEO Accounts are just a subset.

- **Finally**, Defendants are wrong that *CTLI* was decided after a two-day trial. Response 8. *CTLI* was decided after a one-day hearing, and then a second hearing was necessary because the founder objected to the resolution that was agreed after the first hearing. *CTLI* at 363. In any event, the length of the hearing is completely irrelevant to the substance of, and does not form any basis to distinguish, the analysis.

6.  Defendants also are wrong in attempting to distinguish *JLM*. Specifically, Defendants inaccurately represent that *JLM's* analysis was rejected on appeal. While Defendants are correct that *JLM Couture, Inc. v. Gutman*, 2021 WL 827749 (S.D.N.Y Mar. 4, 2021) was vacated in part and remanded by *JLM Couture, Inc. v. Gutman*, 24 F. 4th 785 (2d Cir. 2022), the Debtors do not cite the March 4, 2021 opinion. The Debtors rely on the March 14, 2023 decision, which was issued after and in response to (separate) prior appellate review. *See JLM* at *1.

### A.    Defendants Advocate for a "Better Approach" That Has No Basis in Relevant Case Law and Does Not Help Defendants.

7.  Given their difficulty with the prevailing framework, Defendants create their own. In their view, the "better approach" is to examine factors cobbled together from a misreading of *CTLI* (regarding "persona"), a citation to a law student's comment (individual use of the account and website terms of service), and irrelevant case law (control). Response 9-10. These factors have no basis in any relevant case law; they also do not help defendants.

---

[4]  Moreover, Mr. Owoc agrees. Mr. Owoc asserts that this alleged "Jack Owoc persona" is a brand "*separate and apart* from any product and any company." *See Declaration of John H. Owoc in Support of Response to Motion for Summary Judgment* ("JO Decl.") ¶¶ 7-9, 12, emphasis added). Mr. Owoc does not explain how he plausibly could have cultivated this separate "Jack Owoc persona" that exists "apart from any [Bang Energy Product] or [Bang Energy] company" through use of Bang Energy-branded social media accounts in which he relentlessly appears garbed in Bang Energy attire while displaying Bang Energy drinks. *See generally* JO Decl. Exs. 1-3.

- **First**, *CTLI* discussed *persona* as a possible issue in a case in which the social media account relies on the name and likeness of an individual. *CTLI* at 376. As noted previously, the Debtors do not need Mr. Owoc's identity or his purported "Jack Owoc persona" to operate CEO Accounts and desire to remove his likeness altogether.

- **Second**, analysis of "how the individual account holder uses the account" is already comprehensively addressed in the governing framework. *See JLM* at *10 (including as factors to be considered "the manner in which the account is held out to the public" and "the purpose for which the account has been utilized"). As explained below, that analysis confirms Debtors' ownership of the CEO Accounts.

- **Third**, analysis of "the account ownership interests established in the terms and conditions of the social media website" has no discernible relevance. Defendants offer no explanation how examining those terms and conditions would inform who has an interest in the account as between the business and the CEO, rather than as between either of them and the social media platform provider. Furthermore, Defendants cannot raise the speculative possibility on this topic may aid their position: there is no basis for such speculation, and Defendants have had their opportunity for discovery. *See* Section III, *infra*.

- **Finally**, while Defendants may historically have controlled the CEO Accounts, they did so when they were the CEO and the head of the Debtors' marketing department, respectively. Defendants do not assert that they controlled the accounts in any individual capacity, and they cannot do so now, having previously stated in sworn testimony that the CEO Accounts were created and operated "by someone at Vital"— even if that "someone" was them. *See* § II.C, *infra*.

8.    Defendants' so-called "better approach" should be rejected. It has no foundation in the law, nor is it better, even for Defendants

## II. APPLYING THE *CTLI/JLM* FACTORS TO THE UNDISPUTED FACTS DEMONSTRATES THE DEBTORS OWN THE CEO ACCOUNTS.

9.    *JLM*, relying on the "careful and thoughtful deliberation by both [the *CTLI* and *Philbeck*] courts as to the ownership issue," considered the following three factors: "(1) the manner in which the account is held out to the public; (2) the purpose for which the account has been utilized; and (3) whether employees of the business access the account in furtherance of business interests." *JLM* at *10-11. Application of these factors to the undisputed facts conclusively demonstrates that the Debtors own all three CEO Accounts.

A.     **How the CEO Accounts Were Held Out to the Public Suggests Ownership by the Debtors.**

10.     In determining whether an account has been held out to the public as a company account, "use of the business or entity name to identify the account to the public weighs heavily in finding the account is owned by the entity." *JLM* at *10-11; *see also CTLI* at 367-68 ("The fact that this was a Page . . . entitled "Tactical Firearms" raises a presumption that it was the Debtor's Facebook Page."). Also weighing in favor of company ownership is if the account handle is used by the company on its products, in print advertisements, and on its website. *See JLM* at *11. Finally, the inclusion of links to the company's website and other social media accounts favors company ownership. *See id.*; *CTLI* at 372 (stating that "the fact that the Twitter account . . . was linked to the business's web page" weighed in favor of it being a business account).

11.     Defendants concede that the CEO Accounts have been held out to the public as company accounts. To begin with, Defendants concede that the handles for all three CEO Accounts bear the name of the Company's signature product, Bang Energy. *See* JO Decl. ¶ 11; MO Decl. ¶ 10. While Defendants assert that "Bangenergyceo" is a "double entendre" that also references Mr. Owoc's persona, *see* Response 3, that assertion is (a) entirely unsupported by admissible evidence, (b) directly contradicted by Defendants' own assertions that Mr. Owoc's persona is the "Jack Owoc persona," *see* JO Decl. ¶ 7; MO Decl. ¶ 6, and, most importantly, (c) irrelevant including because Defendants fail to demonstrate that anyone other than Defendants themselves could have been aware of the double entendre. An inside joke between Defendants does not affect how the accounts are held out *to the public*.

12.     Defendants also do not dispute that the handle for the CEO Instagram Account appears on the packaging for the Debtors' signature product, the Bang Energy drink. *See* DiDonato Decl. ¶ 6.

13.     Moreover, Defendants' offered exhibits confirm that all three CEO Accounts link to other Company media, including the Company website, Company social media accounts, and feeds (hashtags) tagging the Company's products. *See* JO Decl., Exs. 1-3 (cataloging (1) Instagram posts that link directly to the CEO Instagram Account and promote hashtags intended to capture the Company (e.g., "#BangEnergy") or the Company's products (e.g., "#bangenergydrink"); (2) CEO TikTok Account description linking directly to the Company's website and hashtags back to the Company and its products; and (3) CEO Twitter Account handle linking to the Company's Twitter handle and hashtags to the Company and its products).[5]

## B.     The Purpose for Which the CEO Accounts Were Used Confirms the Debtors' Ownership

14.     Evidence demonstrating that a social media account was used to promote the company's business points to company ownership. *See JLM* at *13. This is of course true where an account is used for overt marketing of company products, *see JLM* at *13; *CTLI* at 368, but "subtle marketing" also favors company ownership. *Id.* at *13; *CTLI* at 371. Thus, both *JLM* and *CTLI* stand for the proposition that even posts that are allegedly "personal" because they relate to the individual's activities *still* are not personal when they promote the person or the lifestyle in a way calculated to drive engagement with the company or its products. So, in *CTLI*, a tweet about attending a firearms exposition "most assuredly served to develop [the founder's] reputation as being a well-informed, connected insider in the gun-buying community, a reputation that would attract consumers to the business." *CTLI* at 371. And in *JLM*, Gutman's posts regarding her "fashion interests or events going on in her life—including her engagement—reflect[ed] the 'kind

---

[5]  The Debtors also note that the CEO TikTok Account description says "CEO / CSO of Bang Energy." *See* JO Decl., Ex. 2 at 13. Similarly, the CEO Twitter Account says "CEO/CSO of VPX." *See* JO Decl., Ex. 3 at 178. On the other hand, the CEO Instagram Account says "Jack Owoc- Bang Energy," *see* JO Decl., Ex. 1 at 41, but had previously identified Mr. Owoc as the CEO and CSO of Bang Energy prior to his termination.

of subtle marketing' social media is known for" because they promoted a lifestyle favored by the company's target consumers. *JLM* at \*13. Ultimately, the account's purpose is subject to a "holistic" analysis of whether the marketing content tends to outweigh purely personal content (if any). *Id.* at \*14.

15.     Defendants concede that the vast majority of posts to the CEO Accounts *overtly* promote the Company and its products. By their own skewed accounting, roughly half of the posts to the CEO Instagram Account and CEO TikTok account are *not* personal and instead "relat[e] to the Debtors' business." Response 4. Moreover, a simple review of Defendants' evidence demonstrates that most of the CEO Account posts prominently feature Company products and merchandise. *See* JO Decl., Exs. 1-3. Indeed, Mr. Owoc himself *admits* that "during most, if not all of my [Jack Owoc's] and my family's activities during these posts, *we are wearing Bang apparel, drinking a Bang or a Vooz, or otherwise promoting a VPX product.*" JO Decl. ¶ 29 (emphasis added). Mr. Owoc's admission that these product-bearing posts are "promot[ional]" comports with the case law, which dictates that "posts . . . depicting" company products "cannot be properly characterized as personal." *JLM* at \*13.

16.     To the limited extent that other posts do not have the foregoing explicit, and admitted, promotional bent, they are precisely the sort of "subtle marketing" discussed by *CTLI* and *JLM*. Indeed, the exhibits attached to Mr. Owoc's declaration demonstrate that the Bang Energy brand is explicitly associated with weightlifting, fitness, or diet. *See, e.g.*, Ex. 1 at 18, 22; Ex. 2 at 130, 146, 150. Thus, the minority of posts not explicitly related to the Bang Energy brand, still focus on weightlifting, fitness or diet—topics plainly relevant and targeted to consumers of energy drinks with no sugar, carbohydrates, or calories.

17.     Viewing Defendants' proffered evidence holistically—i.e., the CEO Account posts that Defendants have chosen for this Court's review, and Mr. Owoc's description of them—the CEO Accounts overwhelmingly, overtly, and admittedly promote the Company and its products. And the very fact that Mr. Owoc believes the CEO Accounts are paeans to his personality, *see, e.g.*, JO Decl. ¶ 12, is itself a further concession: to the extent, if any, the posts on the CEO Accounts depict Mr. Owoc's personality, they "leverage [his] personality in order to successfully market [the company's] products and the overall brand." *JLM* at *14.

### C.     Whether Other Employees of the Debtors Had Access to the CEO Accounts In Furtherance of Business Interests Favors Ownership by the Debtors

18.     Both the *JLM* and *CTLI* courts emphasize that the ability of employees to access the accounts for business purposes favors company ownership. *JLM* at *14; *CTLI* at 368, 370.

19.     Defendants have previously conceded, and cannot now deny, that the Debtors created and historically controlled the CEO Accounts. In prior deposition testimony, Mr. Owoc testified that "[s]omebody at Vital" unknown to him had created the CEO Instagram and Tiktok Accounts. DiDonato Decl., Ex. C, 84:22-85:6. Mr. Owoc further testified that the "marketing department" was responsible for content posted to those accounts. *Id.* at 86:17-20. Mrs. Owoc similarly testified that "Vital" "operate[d]" the CEO Instagram Account. DiDonato Decl., Ex. D, 22:17. Defendants now attempt a shell game in which Mr. Owoc's reference to an unknown creator was Mrs. Owoc, and Mrs. Owoc's reference to an unnamed operator was Mr. Owoc. *See* Response 14-15. While this proposition is not credible, it is also not relevant. Even in their revisionist history, Defendants concede that, if they created and operated the accounts, they did so in their capacities as "Vital" or "[s]omebody at Vital"—i.e., as the CEO or director of marketing. Defendants cannot now deny this fact. *See Liebman v. Metro. Life Ins. Co.*, 708 F. App'x 979, 983-84 (11th Cir. 2017) ("[W]hen a party has given clear answers to unambiguous questions which negate the existence of

9

any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

20.     In addition, Defendants concede that other employees had "access to the passwords" for the CEO Accounts and that the "marketing department of the Debtors[] created videos that were posted to [the CEO TikTok Account]." JO Decl. ¶ 19; *see also* MO Decl. ¶ 19. Mr. Owoc further admits that that he approved "posting on [the CEO Accounts] of some marketing content created by the Debtors." JO Decl. ¶ 26. Mr. Owoc further asserts that he "approved and/or directed such postings to be made for the benefit of the Debtors." *Id.*

21.     Defendants' prior and incontestable admissions that "Vital" created the accounts, and their current admissions that Debtor employees had access to the accounts for business purposes, further demonstrate that the Debtors own the CEO Accounts. For the foregoing reasons, the undisputed facts demonstrates conclusively that the Debtors own the CEO Accounts.

## III.    THE DISPUTE IS RIPE FOR SUMMARY JUDGMENT.

22.     Defendants argue that summary judgment "is grossly premature," and suggest discovery is necessary to resolve this matter. Response 12. Here, summary judgment is appropriate based on the existing record, notwithstanding Defendants' utterly meritless arguments. "Rule 56 of the Federal Rules of Civil Procedure contemplates that a court may grant summary judgment without the parties having conducted discovery." *Edgewater House Condo. Assoc. v. City of Ft. Lauderdale*, 825 F. App'x 658, 664 (11th Cir. 2020). If a summary judgment motion is filed before discovery, the nonmovant "must specifically demonstrate how postponing the court's ruling would have enabled him, by discovery or other means, to rebut the opposing party's showing of the absence of a genuine issue of fact." *Id.* Defendants have completely failed to make this specific demonstration. Indeed, Defendants' proposed (but unrequested) discovery would not even begin to change the analysis or conclusion:

12094803-1

- ***First***, Defendants offer no credible reason for why deposing Mr. DiDonato would alter the outcome of this Motion. *See* Response 12.

- ***Second***, given that Defendants assert the Employee Handbook is irrelevant, there is no benefit to production of various versions thereof. *See* Response 9.

- ***Third***, Defendants do not need a 30(b)(6) deposition of a "representative of the Debtors knowledgeable about the allegations in the Complaint." Response 9. Until the eve of this Adversary Proceeding, Defendants themselves were the CEO and marketing lead for the company, and the Complaint concerns social media accounts that Defendants assert they have always exclusively controlled.

- ***Fourth***, Defendants' assertion that since their termination they "have had no access to the Debtors' corporate documents, emails and communications," Response 12-13, is incredible given that they submit a company email in connection with their Response. *See* MO Decl., Ex. 1.

## IV.    THE DEBTORS' EVIDENCE IS ADMISSIBLE AND SPEAKS FOR ITSELF.

23.    As a last resort, Defendants seek denial of the Motion "because it relies on inadmissible and mischaracterized evidence." Response 13. Defendants say that the DiDonato Declaration is inadmissible because "there is no ability to discern which portions of the DiDonato declaration derive from his personal knowledge, and which constitute laundered hearsay statements of third parties." *Id.* at 14. But Mr. DiDonato's declaration itself sets forth foundation for his statements: Mr. DiDonato is the Company's Interim CEO and Chief Transformation Officer and he is "familiar with the Debtors' day-to-day operations, business, and financial affairs," which plainly include the Company's marketing and social media activity. *See* DiDonato Decl. ¶ 1. Given that Defendants fail to identify any *specific* statement of Mr. DiDonato that is allegedly hearsay, Mr. DiDonato's established familiarity with the business is ample foundation for his statements. And, as regards the attached documents, they speak for themselves. Defendants' argument that Mr. DiDonato misconstrues those documents—specifically Defendants' deposition testimony—is rebutted by review of the testimony itself.

*[Remainder of page intentionally left blank.]*

12094803-1

## CONCLUSION

For the reasons set forth herein, the Debtors respectfully request that the Court enter an order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    April 21, 2023
           Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*
_____
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
         mniles@bergersingerman.com

George A. Davis (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
        hugh.murtagh@lw.com
        tj.li@lw.com
        brian.rosen@lw.com
        jon.weichselbaum@lw.com

- and -

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

*Co-Counsel for the Plaintiffs/Debtors*

12094803-1