UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al*., | Case No. 22-17842 (PDR) |
| | (Jointly Administered) |
| Debtors.[1] | |

_____/

VITAL PHARMACEUTICALS, INC., *et al.*

      Plaintiffs,

v.

JOHN H. OWOC and MEGAN E. OWOC,      Adv. Pro. No. 23-01051-(PDR)

      Defendants.

_____/

**MOTION FOR PRELIMINARY INJUNCTION
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the above-captioned adversary proceeding (this "Adversary Proceeding") under Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Debtor Vital Pharmaceuticals, Inc., and its affiliated debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (the "Debtors," the "Plaintiffs," or the "Company"), respectfully bring this motion (this "Motion") seeking entry of a

---

[1] The Debtors include (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc.; (iii) JHO Intellectual Property Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicorn Bev LLC; and (vii) Vital Pharmaceuticals International Sales, Inc.  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

preliminary injunction, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) prohibiting Defendants John ("Jack") H. Owoc and Megan E. ("Meg Liz") Owoc (together, "Defendants") from accessing, using, deleting, or modifying in any way the CEO Accounts (as defined herein), (b) converting the Temporary Restraining Order (as defined herein) entered by this Court into a Preliminary Injunction and extending the injunctive relief granted therein through the resolution of this Adversary Proceeding, and (c) granting related relief. As grounds for the relief requested in this Motion, the Debtors rely on the *Declaration of John C. DiDonato in Support of Debtors' Motion for Preliminary Injunction* (the "DiDonato Decl.") filed concurrently herewith and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have been granted control over and access to the CEO Accounts[2] pursuant to the Temporary Restraining Order[3] entered by this Court. With that control, the Debtors are able to preserve the integrity and value of the CEO Accounts, which collectively have millions of followers. However, the Temporary Restraining Order is set to expire on May 29, 2023. It is critical that this Court enter a preliminary injunction extending the protections afforded under the Temporary Restraining Order and preserving the status quo during the pendency of this Adversary Proceeding. Defendants have demonstrated the peril of the alternative: When permitted to retain access, Defendants repeatedly posted defamatory comments on the CEO Accounts to the detriment of the Debtors and the accounts themselves. Defendants have demonstrated that they cannot be trusted with control of the CEO Accounts until this Adversary Proceeding is adjudicated. An

---

[2] The "CEO Accounts" means, collectively, the Instagram account with the handle "@bangenergy.ceo" (the "CEO Instagram Account"; the TikTok account with the handle "@bangenergy.ceo" (the "CEO TikTok Account"); and the Twitter account with the handle @BangEnergCEO (the "CEO Twitter Account").

[3] The Temporary Restraining Order means, collectively, the *Order Denying Emergency Motion for Relief from Unauthorized Stipulation and Extending Temporary Restraining Order* [Adv. Proc. ECF No. 81] (the "TRO Extension Order") and *Order Approving Stipulation Regarding Debtors' Motion for Temporary Restraining Order* [Adv. Proc. ECF No. 10] (the "TRO Order").

injunction is necessary to prevent Defendants from posting further content to the CEO Accounts that would be harmful to the Debtors and the accounts, or altering the accounts in any way. It took multiple motions and hearings (and substantial time and resources of the estates and this Court) to finally get Defendants to comply with this Court's orders and turn over control of the CEO Accounts to the Debtors, and the Debtors have dutifully safeguarded the CEO Accounts since. The current status quo is preserving the value of the CEO Accounts, and thus, should be extended through issuance of a preliminary injunction.

## JURISDICTION AND VENUE

2.      The Debtors commenced the Adversary Proceeding pursuant to sections 542(a) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rule 7001(1).

3.      The Court has jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157 and 1334. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) because it arises under the Bankruptcy Code and arises in a case under the Bankruptcy Code.

4.      Venue of the Chapter 11 Cases and this Adversary Proceeding, as well as adjudication of this Motion, is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      In accordance with Bankruptcy Rule 7008(a), the Debtors consent to the entry of a final order or judgment on this Motion by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

6.      Since as early as 2010, the Debtors have made strategic use of a variety of non-traditional marketing channels, including marketing directly to customers through various social media platforms. DiDonato Decl. ¶ 5. As of the Petition Date, the Debtors created and operated

12142912-1

a number of social media accounts as part of their marketing efforts. *Id.* Both pre- and post-petition, the Company's marketing department created content that was posted across their various social media accounts in a regular and coordinated fashion. *See id.* ¶ 7.

7.     The CEO Accounts were among the accounts created by the Company's marketing department and for which the Company's marketing department curated and posted content for purposes of promotion of the Debtors' products and business. *Id.* The CEO Instagram Account is a verified account created in April 2012 with over 1 million followers and more than 6,400 posts, the vast majority of which promote the Debtors' products and business. *Id.* ¶ 6. Similarly, the CEO TikTok Account was created in 2019 and has over 850,000 followers, with content primarily focused on promoting the Debtors' products and business. *Id.* ¶ 7. And the CEO Twitter Account, created in 2010, has over 7,000 followers, with content primarily focused on promoting the Debtors' products and business. *Id.*

8.     During depositions in an unrelated matter, Defendants testified that the CEO Accounts were created and operated by the Company, and the Company's marketing department created videos which were then posted to the CEO Accounts. *Id.* at Ex. C, 84:10-16, 84:22-85:1-6, 86:2-20; *id.* at Ex. D, 22:17-19. All three CEO Accounts cross-reference each other's content. *Id.* ¶ 7.

9.     Only a few employees of the Company, including Defendants, had direct access to the CEO Accounts, including knowledge of the login credentials and the ability to post content. *See id.* ¶ 8.

## A.     The Chapter 11 Cases

10.     On October 10, 2022 (the <u>Petition Date</u>), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered.

4

11.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108, 11 U.S.C. §§ 1107, 1108.

12.     On November 1, 2022, the Office of the United States Trustee (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") [ECF No. 245].   On November 23, 2022, the U.S. Trustee reconstituted the Committee [ECF No. 400].   No request has been made to the Court to order the appointment of a trustee or examiner.

13.     On February 24, 2023, the Court entered an order (the "Bid Procedures Order") [ECF No. 854] approving bidding procedures for the sale of all or substantially all of the Debtors' assets upon the conclusion of the Debtors' marketing and sale process.

14.     In order to preserve and maximize the value of the bankruptcy estate, the Debtors continue to operate, including their marketing efforts, in the ordinary course.

**B.     The Board's Termination of Mr. and Mrs. Owoc**

15.     Defendant Jack Owoc is the Company's founder and former Chief Executive Officer and Chief Science Office.  DiDonato Decl. ¶ 8, Ex. E.  Defendant Meg Liz Owoc, working under various job titles, directed the Debtors' marketing department.  *Id.* ¶ 8, Ex. F.

16.     On March 9, 2023, the Debtors' boards of directors and managers (collectively, the "Board") voted to terminate the employment of Mr. Jack Owoc and Mrs. Meg Liz Owoc, and to remove Mr. Owoc from the Board for cause.   DiDonato Decl. ¶ 8.   Following Mr. Owoc's termination, Mr. John DiDonato of Huron Consulting, who had been serving as the Debtors' Chief Transformation Officer, was named by the Board as the Debtors' Interim Chief Executive Officer. *See id.* ¶ 1.

17.     The Company promptly notified Defendants and their individual counsel of the Board's decision to terminate their employment.  *See id.* ¶ 9, Ex. G & H.  As part of those notices, the Company directed Defendants to immediately return all of the Debtors' property, including,

5

among other items, any access codes or devices, mobile phones, computers, and any other property and information.  *Id.*

18.    Given the management transition, the Company and its advisors worked to secure all estate property, including access to the Company's social media accounts.  *Id.* ¶ 10.  While the Debtors were able to secure a majority of the social media accounts and changed login credentials and points of contact, they were unable to obtain the current login credentials to the three CEO Accounts.  *Id.*  On March 10, 2023, the Company sent a letter to counsel for Defendants reiterating the need that they promptly return all Company property and demanding that they reveal the login credentials to the CEO Instagram Account.  *Id.* ¶ 11, Ex. I.

19.    On March 14, 2023, Debtors filed this Adversary Proceeding and concurrently sought a temporary restraining order that would prohibit the Owocs from using, and require them to turn over to Debtors control of, the CEO Accounts.  *See* Adv. Proc. ECF Nos. 1, 2.  On March 16, 2023, the parties stipulated that Defendants would provide the CEO Accounts passwords to the Court by 5:00 p.m. on March 16, refrain from posting any content or making any posts of any kind to or from the CEO accounts for a period of 45 days, and post content to the CEO Accounts as requested by the Debtors.  *See* Adv. Proc. ECF No. 9 ("TRO Stipulation").  That same day, the Court entered an Order approving the TRO Stipulation.  *See* TRO Order.

20.    Defendants, however, failed to provide the Court with the login credentials by the agreed-upon deadline.  After numerous attempts to engage with Defendants concerning the log-in credentials and negotiate a summary judgment briefing schedule, the Debtors received no response and were forced to bring an emergency motion seeking an order holding Defendants in contempt, among other relief.  *See* Adv. Proc. ECF No. 13.  Shortly before the hearing on the motion, Defendants' counsel (at that time Mr. Justin Luna) confirmed submission to the Court of the login

12142912-1

credentials for two of the three CEO Accounts,[4] and also informed Debtors' counsel that he would be withdrawing as counsel for Defendants. Replacement counsel, Jeremy R. Fischer of Drummond Woodsum and Jay Geller of the Law Office of Jay S. Geller, attended the March 23 hearing on the Debtors' contempt motion.

21. On March 24, 2023, the Debtors notified Messrs. Fischer and Geller that they were invoking their rights under the TRO Order to have certain content posted to the CEO Instagram Account. *See Emergency Motion for an Order (I) Holding Defendants in Contempt of Court, (II) Imposing Sanctions, and (III) Setting Hearing on Debtors' Motion for Temporary Restraining Order* [Adv. Proc. ECF No. 28] at 4-5. The requested content was posted to the CEO Instagram Account. However, later that day, Mr. Fischer notified the Debtors that he and Mr. Geller would no longer be representing Defendants. *Id.* at 5.

22. On April 4, 2023, Brad Shraiberg and Patrick Dorsey of Shraiberg Page P.A. informed the Debtors would be serving as counsel to Defendants. On April 6, 2023, the Debtors notified Defendants that they were again invoking their right under the TRO Order to have certain content posted to the CEO Instagram Account, and again provided the content to be posted. *Order Granting Plaintiffs' Emergency Motion for Contempt* (the "Contempt Order") [Adv. Proc. ECF No. 61] at 4. On April 10 (despite the requirement to post within nine hours), Defendants posted the requested content. *Id.* But Defendants did not stop there. Defendants added commentary disparaging the Company, its professionals, its Board, and its lenders, and claiming that their posting was "forced [upon them] by threat," that the result was a "major fraud on the public," that the "FLORIDA BANKRUPTCY COMMUNITY MUST BE BROUGHT TO JUSTICE," and that "[t]he bankruptcy community corruption here in South Florida is real." *Id.* at 4-5.

---

[4] Counsel represented that Defendants were unable to locate the password for the CEO TikTok account.

12142912-1

23.     On April 25, 2013, this Court found Mr. Owoc's conduct "wrongful[]" and held Mr. Owoc in contempt of court for violating the TRO Order.  Contempt Order at 14 & ¶ 1.  The Court further required Mr. Owoc to (i) delete his "patently false" comments or incur a $25,000 per day fine for each day the comment remains on Instagram and (ii) turn over to the Debtors' counsel passwords for each of the CEO Accounts so that the Debtors may change the passwords for each of the CEO Accounts.  *Id.* ¶¶ 2-4.  Moreover, this Court found that Mr. Owoc's overt purpose was to post content harmful to the Debtor's business while claiming license pursuant to an objectively unreasonable reading TRO Order.  *Id.* at 15 (dismissing Mr. Owoc's argument that he was permitted to make harmful "comments" because comments were not "posts.").  As the Court noted, that conduct was the very reason the Debtors initially sought a temporary restraining order—*i.e.*, to "prohibit the Owocs from using … the CEO Accounts because the Plaintiffs were concerned the Owocs would post content harmful to the Plaintiffs' business."  *Id.* at 15.

24.     Defendants' disregard for the Court did not end with this Court's Contempt Order.  As of May 1, 2023, Defendants had not given the Debtors control of the CEO Accounts such that they could change the passwords for each of the CEO Accounts.  May 1, 2023 Hr'g Tr. at 12:2-19, 24:15-13, 45:12-20.  Thus, this Court found Defendants again to be in violation of an order of this Court and ordered Defendants to comply with the Contempt Order.  *See Order Holding Defendant, John H. Owoc, in Contempt of Court for Failure to Comply with Paragraph 4 of Order Granting Plaintiffs' Emergency Motion for Contempt [ECF No. 61]* [Adv. Proc. ECF No. 80].

25.     As a consequence of Defendants' further disregard for this Court's authority, the Court extended the TRO Order for a period of twenty-eight (28) days through May 29, 2023.  *See* TRO Extension Order.

26.    On March 31, 2023, the Debtors filed the *Motion for Summary Judgment and Incorporated Memorandum of Law* (the "MSJ") [Adv. Proc. ECF No. 20]. On April 25, 2023, this Court heard argument on the MSJ and took the matter under advisement.

27.    The Debtors remain concerned that if control of the CEO Accounts reverts back to Defendants, then Defendants will again post content that is harmful to the Debtors or otherwise will compromise the integrity of the accounts. *See* DiDonato Decl. ¶ 14. Defendants have proven time and time again that they cannot be trusted with control over the CEO Accounts and have posted content that is harmful to or intended to harm the Debtors, their business, their product marketing, and/or their bankruptcy sale process. *See id*.; *see generally* Contempt Order. The Debtors are also concerned that bidders may view any disruption to the Debtors' marketing efforts negatively, and that in turn it would result in substantially lower bids for the Debtors' assets or the decision not to bid for the assets at all. *See id.* ¶ 13.

## ARGUMENT

28.    "Entitlement to preliminary injunctive relief requires the movant to demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the movant outweighs any potential harm to the party being enjoined; and (4) that granting the injunction would not be adverse to the public interest." *MediaOne of Delaware, Inc. v. E & A Beepers & Cellulars*, 43 F. Supp. 2d 1348, 1353 (S.D. Fla. 1998) (citing *American Red Cross v. Palm Beach Blook Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).[5] Because the Debtors satisfy each of these factors, the Court should grant this Motion.

---

[5] The Debtors also request that this Court not require them to provide any security in connection with the temporary restraining order as permitted under Bankruptcy Rule 7065. *See* Fed. R. Bankr. P. 7065 (("[Federal] Rule 65 . . . applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with [Federal] Rule 65(c).").

# I.     THE DEBTORS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS

29.     "'[A] substantial likelihood of success on the merits' requires a showing of only *likely*, rather than *certain*, success." *Home Oil Co. v. Sam's E., Inc.*, 199 F. Supp. 2d 1236, 1249 (M.D. Ala. 2002) (emphasis in original).  Section 542(a) of the Bankruptcy Code "authorizes a bankruptcy court to order turnover of the debtor's property held by others." *In re Empire for Him, Inc.*, 1 F.3d 1156, 1160 (11th Cir. 1993).  To successfully move for turnover of estate property, a debtor "must prove that the subject property constitutes property of the estate and that the defendant is in possession of that property." *In re Rogove*, 443 B.R. 182, 186 (Bankr. S.D. Fla. 2010).  The applicable standard "is by preponderance of the evidence." *Id.*  The Debtors have a strong probability of successfully showing that the CEO Accounts are estate property.

## A.     The CEO Accounts Are Property of the Estates

30.     Under the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  As in other circuits, the Eleventh Circuit holds that the "scope of [section] 541(a)(1) is broad, and includes property of all types, tangible and intangible." *In re Meehan*, 102 F.3d 1209, 1210 (11th Cir. 1997).

31.     Social media accounts are property of a debtor's estate when the content of the accounts is associated with the debtor's business and use of the accounts is "clearly to generate revenues for the company." *See In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D. Tex. 2015); *see also ME Tech., Inc. v. Brownstein*, No. 20-cv-61508, 2020 LEXIS 215907, at *1 (S.D. Fla. Nov. 13, 2020) (recognizing property interest in social media accounts); *JLM Couture, Inc. v. Gutman*, No. 20 CV 10575-LTS-SLC, 2023 LEXIS 42962, at *34-35 (S.D.N.Y. Mar. 14, 2023) ("intangible

property such as websites and account information can be the object of conversion" in the course of enjoining ex-employees and contractors to return social media accounts).

32.    *CTLI* and *JLM* are particularly instructive.  In *CTLI*, the bankruptcy court found that a Facebook page and a Twitter account were business accounts belonging to the debtor, not the debtor's founder.  *CTIL*, 528 B.R. at 366-74.  In reaching its conclusion, the bankruptcy court noted that the accounts' names were related to the business, they were directly linked to the debtor's business website, much of the posted content was expressly business-related and promoted the business, and other employees had access to the account.  *Id.*  In addition, the bankruptcy court rejected arguments that the Facebook account was the founder's personal property because it also included personal content, a fact "utterly insufficient to overcome the presumption that that the Facebook Page . . . was anything other than what it appeared to be: a business Facebook Page for the business."  *Id.* at 368.

33.    *JLM*, relying on the "careful and thoughtful deliberation by both [the *CTLI* and *Philbeck*] courts as to the ownership issue," considered the following three factors: "(1) the manner in which the account is held out to the public; (2) the purpose for which the account has been utilized; and (3) whether employees of the business access the account in furtherance of business interests."  *JLM*, 2023 LEXIS 42962, at *10-11.  Application of these factors to the undisputed facts conclusively demonstrates that the Debtors own all three CEO Accounts.

       *1.*    *How the CEO Accounts Were Held Out to the Public Suggests Ownership by the Debtors*

34.    In determining whether an account has been held out to the public as a company account, "use of the business or entity name to identify the account to the public weighs heavily in finding the account is owned by the entity."  *JLM*, 2023 LEXIS 42962, at *10-11; *see also CTLI* at 367-68 ("The fact that this was a Page . . . entitled "Tactical Firearms" raises a presumption that

11

12142912-1

it was the Debtor's Facebook Page.").  Also weighing in favor of company ownership is if the account handle is used by the company on its products, in print advertisements, and on its website.  *See JLM*, 2023 LEXIS 42962, at *11.  Finally, the inclusion of links to the company's website and other social media accounts favors company ownership.  *See id.*; *CTLI*, 528 B.R. at 372 (stating that "the fact that the Twitter account . . . was linked to the business's web page" weighed in favor of it being a business account).

35.     It is indisputable that the CEO Accounts have been held out to the public as company accounts.  To begin with, all three CEO Accounts bear the name of the Company's signature product, Bang Energy.  *See* DiDonato Decl. ¶ 6; *see also JLM*, 2023 LEXIS 42962, at *40-41 ("use of the business or entity name to identify an account to the public weighs heavily in favor of finding the account is owned by the entity rather than by the individual").  Moreover, the CEO Account handles appear on the packaging for the Debtors' signature product, the Bang Energy drink, encouraging consumers to follow the CEO Accounts to obtain Company information.  *See id*.  In addition, all three CEO Accounts link to other Company media, including the Company website, Company social media accounts, and feeds (hashtags) tagging the Company's products.  DiDonato Decl. ¶ 7.[6]

          2.     *The Purpose for Which the CEO Accounts Were Used Confirms the Debtors' Ownership*

36.     Evidence demonstrating that a social media account was used to promote the company's business points to company ownership.  *See JLM*, 2023 LEXIS 42962, at *13.  The fact that Defendants may also have posted some personal content does not change the business

---

[6]  The CEO TikTok Account description says "CEO / CSO of Bang Energy."  *See Declaration of John H. Owoc in Support of Response to Motion for Summary Judgment* [Adv. Proc. ECF No. 41] (the "JO Decl."), Ex. 2 at 13.  Similarly, the CEO Twitter Account says "CEO/CSO of VPX."  *See* JO Decl., Ex. 3 at 178.  On the other hand, the CEO Instagram Account says "Jack Owoc- Bang Energy," *see* JO Decl., Ex. 1 at 41, but had previously identified Mr. Owoc as the CEO and CSO of Bang Energy prior to his termination.

nature of the CEO Accounts.  *See In re CTLI*, 528 B.R. at 368.  Both *JLM* and *CTLI* stand for the proposition that even posts that are allegedly "personal" because they relate to the individual's activities *still* are not personal when they promote the person or the lifestyle in a way calculated to drive engagement with the company or its products.  In *CTLI*, a tweet about attending a firearms exposition "most assuredly served to develop [the founder's] reputation as being a well-informed, connected insider in the gun-buying community, a reputation that would attract consumers to the business."  *CTLI*, 528 B.R. at 371.  And in *JLM*, Gutman's posts regarding her "fashion interests or events going on in her life—including her engagement—reflect[ed] the 'kind of subtle marketing' social media is known for" because they promoted a lifestyle favored by the company's target consumers.  *JLM*, 2023 LEXIS 42962, at *13.  Ultimately, the account's purpose is subject to a "holistic" analysis of whether the marketing content tends to outweigh purely personal content (if any).  *Id.* at *14.

37.  The vast majority of posts to the CEO Accounts *overtly* promote the Company and its products.  *See* DiDonato Decl. ¶ 7.  Indeed, in opposition to the Debtors' motion for summary judgment, Defendants identified "representative samples of the clearly personal Instagram postings."  *See* JO Decl. ¶ 29.  Even in this cherry-picked sampling, nearly every post displays Bang apparel, Bang cans or another VPX beverage, or otherwise promotes a VPX product.  *See generally id.* at Ex. 1 (the first "personal" post shows Mr. Owoc in front of Bang cans, the second "personal" post advertises the Company's Fuel Your Destiny campaign and has no connection to Defendants whatsoever, the third "personal" post advertises the Company's philanthropic endeavors and also has no connection to Defendants whatsoever; the theme repeating for 88 pages).  Since the vast majority of posts on the CEO Accounts overtly feature the Company's products and case law dictates that "posts . . . depicting" company products "cannot be properly

characterized as personal," the vast majority of the posts on the CEO Accounts cannot be credibly characterized as personal. *JLM*, 2023 LEXIS 42962, at *13.

38.     Even the limited posts that do not explicitly promote the Company's products still focus on weightlifting, fitness or diet topics plainly relevant and targeted to Bang's brand and target consumer, consumers of energy drinks with no sugar, carbohydrates, or calories. DiDonato Decl. ¶ 7. These posts, while not overt marketing of the Debtors' products, constitute "subtle marketing" furthering the Debtors' interests, and still weigh in favor of finding the Debtors' ownership. *See JLM*, 2023 LEXIS 42962, at *13; *CTLI*, 528 B.R. at 371.

> 3.     *Whether Other Employees of the Debtors Had Access to the CEO Accounts In Furtherance of Business Interests Favors Ownership by the Debtors*

39.     Both the *JLM* and *CTLI* courts emphasize that the ability of employees to access the accounts for business purposes favors company ownership. *JLM*, 2023 LEXIS 42962, at *14; *CTLI*, 528 B.R. at 368, 370.

40.     The Debtors created and historically controlled the CEO Accounts. In prior deposition testimony, Mr. Owoc testified that "[s]omebody at Vital" unknown to him had created the CEO Instagram and Tiktok Accounts. DiDonato Decl., Ex. C at 84:22-85:6. Mr. Owoc further testified that the "marketing department" was responsible for content posted to those accounts. *Id.* at 86:17-20. Mrs. Owoc similarly testified that "Vital" "operate[d]" the CEO Instagram Account. DiDonato Decl., Ex. D at 22:17. Furthermore, at a hearing before this Court on related matters on May 11, 2023, counsel for Defendants explained that their failure to provide the password for one of the CEO Accounts was due to the fact that the account was linked to a "Bang Energy email

address."[7]  Defendants' prior and incontestable admissions that "Vital" created, controlled, and operated the accounts further demonstrate that the Debtors own the CEO Accounts.

**B.      The CEO Accounts are in Defendants' Possession or Will Revert to Defendants' Possession**

41.      Historically, access to the CEO Accounts has been maintained by a limited number of individuals, including Defendants.  *See* DiDonato Decl. ¶ 8.  Following termination of Defendants from their respective positions at the Company on March 9, the Debtors tried to secure all of the Company's social media accounts, but were unable to obtain access to the CEO Accounts. *Id.*  Defendants demonstrated that they (wrongfully) controlled access to the CEO Accounts when they were able to turn over passwords associated with two of the accounts to the Court on March 23, 2023.  It was only after multiple orders from this Court that Defendants turned over control of those to the Debtors.    If the TRO is not converted into a preliminary injunction and extended through the pendency of this Adversary Proceeding, then presumably the Court will require that the accounts revert to the control of the Defendants.  In that event, as the history here makes clear, it will take weeks if not months of effort by the Debtors and this Court to later restore access to the Debtors.

**II.      THE DEBTORS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION**

42.      Defendants have repeatedly and openly flouted this Court's orders and been held in contempt of court for posting "content harmful to the [Debtors'] business."  Contempt Order at 14.  The pattern and practice that Defendants have exhibited of committing the precise harmful conduct that the Debtors' sought to prevent in the TRO is evidence of the harm that will be suffered absent an injunction.  Defendants cannot be trusted with control over the CEO Accounts and a

---

[7]  The transcript for the referenced hearing is not yet available.  The Debtors will provide relevant excerpts promptly upon the transcript's becoming available.

12142912-1

preliminary injunction is necessary to prevent further harm pending resolution of this Adversary Proceeding.

43.     Moreover, the Debtors are at a critical juncture in the Chapter 11 Cases in which they are seeking to solicit qualified, binding bids and consummate a sale.  DiDonato Decl. ¶ 13.  Thus, it is imperative that the Debtors secure all of their assets as well as continue their normal operations, including marketing efforts, at this time.  *Id.*

44.     The concerns regarding control of these particular social media accounts are especially significant because of their importance to the Company's business.  The CEO Instagram Account alone has over 1 million followers.   It and the other CEO Accounts have been used consistently to promote the Debtors' business and products with positive, brand-focused messaging.  *See generally* JO Decl., Exs. 1-3.  As Defendants have demonstrated multiple times, should control over the CEO Accounts revert back to Defendants, then there is real risk that they will use the CEO Accounts to post their personal grievances and negative and inflammatory commentary concerning the Debtors, their business, and the bankruptcy process.  DiDonato Decl. ¶ 14; *see* Contempt Order at 14.  Such messaging is plainly antithetical to the historical use and purpose of the accounts, and is likely to—frankly, is intended to—have a significant adverse effect on the Debtors and their estates.

45.     Accordingly, the Debtors submit that they will suffer immediate and irreparable harm if a preliminary injunction is not entered and access to the CEO Accounts reverts to Defendants.

### III.     BALANCE OF HARMS WEIGHS GREATLY IN THE DEBTORS' FAVOR

46.     The balance of harms greatly favors the Debtors.  The harm the Debtors will suffer in the absence of a preliminary injunction, as described above, is substantial and irreversible.

12142912-1

47.     Moreover, any harm Defendants will suffer from the preliminary injunction is minimal or nonexistent and reversable.  The TRO grants the Debtors control but not license to post.  The Debtors have demonstrated that they will abide by the terms of the TRO, including by seeking this Court's permission even to post a statement required under the terms of a federal court judgment.  *See Emergency Motion to Allow Debtors to Post "Corrective Statement" on the CEO Accounts* [Adv. Proc. ECF No. 77].   There is no risk that the Debtors will change course and instead unilaterally post content inconsistent with the TRO.  As such, the only conceivable harm to Defendants is temporary silence while the Court determines whether Defendants or the Debtors own the CEO Accounts.  If the Court determines that Defendants own the CEO Accounts, then Defendants will thereafter be able to put the accounts to their own purposes, without the Debtors having compromised them in the interim.  The reverse plainly is not true.

## IV.     A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC'S INTEREST

48.     The public interest weighs heavily in favor of granting the requested relief.  "In the context of bankruptcy proceedings, the 'public interest' element means 'the promoting of a successful reorganization.'"  *In re Am. Film Techs., Inf.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) ("It is 'one of the paramount interests' of this court to assist the Debtor in its reorganization efforts.").  The foregoing principles set forth in *American Film Technologies* apply with equal force to the present situation in which the Debtors are pursuing a successful sale of their assets for the benefit of their estates and relies on their ability to continue normal business operations.  And, in any event, the public will suffer no harm by the requested relief.

## CONCLUSION

49.     For all the foregoing reasons, the Debtors respectfully request that the Court enter an order granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:    May 12, 2023
        Miami, Florida

George A. Davis (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       hugh.murtagh@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

- and -

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
_____
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com

*Co-Counsel for the Debtors*

12142912-1

## Exhibit A

### Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al*.,         Case No. 22-17842 (PDR)
                                                          (Jointly Administered)
        Debtors.[8]

_____/

VITAL PHARMACEUTICALS, INC., *et al.*

            Plaintiffs,

v.

JOHN H. OWOC and MEGAN E. OWOC,              Adv. Pro. No. 23-01051 (PDR)

            Defendants.

_____/


**ORDER GRANTING EMERGENCY
MOTION FOR PRELIMINARY INJUNCTION**

---

[8]  The Debtors include (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc.; (iii) JHO Intellectual Property
     Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicorn Bev LLC;
     and (vii) Vital Pharmaceuticals International Sales, Inc.  The address of the Debtors is 1600 N. Park Drive, Weston,
     FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals,
     Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO
     Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and
     (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

12142912-1

**THIS MATTER** was before this Court on May ___, 2023, at _____ [_.m.] in Fort Lauderdale, Florida, upon the *Debtors' Motion for Preliminary Injunction and Incorporated Memorandum of Law* [Adv. Proc. ECF No. ___] (the "Motion")[9] filed by the debtors and debtors-in-possession (the "Debtors") in the above-captioned adversary proceeding.  The Motion seeks entry of an order (a) prohibiting Defendants John H. Owoc and Megan E. Owoc (together, "Defendants") from accessing, using, deleting, or modifying in any way the CEO Accounts or content posted thereon; (b) compelling Defendants to transfer exclusive control of the CEO Accounts to the Debtors; (c) ordering that the CEO Accounts shall remain in the exclusive control of the Debtors pending full and final adjudication of the Adversary Proceeding; and (d) granting related relief.  The Court finds and concludes that:

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Notice of the Motion was sufficient under the circumstances.

C.     The legal and factual bases set forth in the Motion and the accompanying declarations and related papers and at the hearing establish just cause for the relief granted herein.

Accordingly, it is

**ORDERED** as follows:

1.     The Motion is GRANTED as to the request for a preliminary injunction under sections 105(a) and 542 of the Bankruptcy Code, Rule 65 of the Federal Rules of Civil Procedure, and Rule 7065 of the Federal Rules of Bankruptcy Procedure.

---

[9]   Capitalized terms used but not defined herein have the meanings given to them in the Motion.

12142912-1

2.      Pending a hearing and determination on the Debtors' claims set forth in the Complaint, Defendants are prohibited from accessing, using, deleting, or otherwise modifying the CEO Accounts, or any content posted thereon.

3.      The temporary restraining order entered in the *Order Approving Stipulation Regarding Debtors' Motion for Temporary Restraining Order* [ECF No. 10] and as extended and modified by the *Order Denying Emergency Motion for Relief from Unauthorized Stipulation and Extending Temporary Restraining Order* [ECF No. 81] is hereby converted into a Preliminary Injunction which shall remain in effect pending final judgment in this Adversary Proceeding or further action by this Court.

4.      Nothing in this Order shall prevent the Debtors from seeking further relief with respect to the CEO Accounts or any other accounts used in the ordinary course of the Debtors' business operations.

5.      Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedures, the Debtors are relieved from posting any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

6.      The Debtors shall serve a copy of this Order on counsel for Defendants within (1) business day of the entry of this Order.

7.      The Court retains jurisdiction over this Order and the relief granted herein.

# # #

12142912-1

<u>Submitted by</u>:
Jordi Guso, Esq.
Michael J. Niles, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  jguso@bergersingerman.com
Email:  mniles@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

4