

**ORDERED in the Southern District of Florida on June 16, 2023.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 22-17842-PDR |
| Vital Pharmaceutical, | Chapter 11 |
|     Debtor. | |
| _____/ | |
| Vital Pharmaceuticals, Inc., *et al.*, | Adv. No. 23-1051-PDR |
|     Plaintiffs, | |
| v. | |
| John H. Owoc, *et al.*, | |
|     Defendants. | |
| _____/ | |

**MEMORANDUM OPINION GRANTING**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Social media has infiltrated our daily lives so rapidly that the law—as is often

the case—has simply been unable to keep pace. The evolving use of social media for

business—and the growth of influencer marketing—has magnified the importance of what to date has been an obscure legal issue: How is ownership of the rights to a social media account determined?[1]

Determining ownership of these rights has potentially significant consequences because with the account go the followers, sometimes numbering in the millions. Although the value of the rights to an account is difficult to assess, it may be substantial given its direct product marketing potential. Thus, the determination of ownership may have a considerable impact on the outcome of a bankruptcy case, not to mention in other legal contexts. But there is a dearth of legal guidance.

To understand the history of social media and its rapid evolution is to understand the need for regulation and standardization, including the issue of ownership. The earliest social networking sites date back more than two decades with the launch of SixDegrees.com (1997),[2] Friendster (2001),[3] and Myspace (2003).[4]

---

[1] Describing a user's interest in a social media account is difficult. With respect to some sites, such as TikTok and Twitter, a social media user's right to use the platform is defined as a "license." But, in some cases, such as Instagram, that right is not defined at all. For ease of reference, the Court will refer to "ownership of the rights to social media accounts" to encompass whatever rights a user has— whether it be a license or otherwise—to access and use a social media account.

[2] *Social Media*, Encyclopedia Britannica, https://www.britannica.com/topic/social-media#ref1303882; *see also Gonzalez v. Google LLC*, 2 F.4th 871, 951 n.8 (9th Cir. 2021) (Katzman, C.J., concurring).

[3] Matthew Jones*, The Complete History of Social Media: A Timeline of the Invention of Online Networking* (Hist. Cooperative June 16, 2015), https://historycooperative.org/the-history-of-social-media/).

[4] *Myspace*, Encyclopedia Britannica, https://www.britannica.com/topic/Myspace ("Tom Anderson and Chris DeWolfe, employees of the Internet marketing company eUniverse (later Intermix Media), created Myspace in 2003.").

Peaking at 115 million users, Myspace was the most popular social network site from 2005 to 2008.[5]

By 2009, however, Facebook eclipsed Myspace and has since grown to nearly three billion users.[6] During that time, many other sites have proliferated the social media landscape, offering a myriad of ways for users to share content or engage with others—e.g., Twitter (microblogging); Instagram (photo-sharing); TikTok (short videos); Snapchat ("stories"); Reddit (news aggregation); Pinterest ("pinboards"); and YouTube (hosting a wide range of video content). In 2023, there are reportedly more than 4.75 billion social media users worldwide.[7]

As the use of social media has evolved as a means of social interaction, so too has its use for business. Before the meteoric rise of Facebook, direct consumer engagement on a large scale had not been possible.[8] Now, not only do social media sites monetize their content by allowing ads, but companies also use social media to affect buying habits through "a type of social media marketing that uses endorsements and product mentions from influencers—individuals who have a dedicated social following and are viewed as experts within their niche."[9] Social media

---

[5] *Social Media*, Encyclopedia Britannica, https://www.britannica.com/topic/Myspace; *see also* Myspace, Wikipedia, https://en.wikipedia.org/wiki/Myspace; *The Evolution of Social Media: How Did it Begin, and Where Could it Go next*, Maryville University, https://online.maryville.edu/blog/evolution-social-media/.

[6]     *Myspace*,     Wikipedia,     https://en.wikipedia.org/wiki/Myspace;     *Facebook*,     Wikipedia, https://en.wikipedia.org/wiki/Facebook.

[7] *Social Media*, Wikipedia, https://en.wikipedia.org/wiki/Social_media.

[8] *Facebook*, Encyclopedia Britannica, https://www.britannica.com/topic/Facebook.

[9] *Evolution of Social Media*, *supra* note 5 (quoting *What is influencer marketing: How to develop your strategy*, Sprout Social, https://sproutsocial.com/insights/influencer-marketing/ (Apr. 17, 2023)).

influencers "have perfected the art of self-commoditization, turning their personal image or reputation (also known as their 'brand' or 'persona') and their recommendations into highly valuable tools."[10] In 2023, influencer marketing is projected to be a $21.1 billion industry.[11]

Vital Pharmaceuticals, along with its affiliates ("Vital"), the Debtors in this chapter 11 case, is attempting to sell its business, which in large part is the manufacture and sale of "Bang" products, including Bang energy drink. Vital attributes much of its success to social media marketing. And it believes access to its social media accounts is necessary to maximize the value of its assets. John H. "Jack" Owoc (Vital's sole shareholder and former Chief Executive Officer), however, claims to own the rights to three social media accounts that have been used to promote Vital's products. He claims those accounts cultivate and market his persona as an "explosive, high-intensity, unstoppable leader." When Mr. Owoc worked for Vital as its CEO, ownership of the rights to these social media accounts was not an issue. But upon the companies' dismissal of Mr. Owoc, he and Vital both laid claim to the accounts, resulting in the dispute presently before the Court.

Vital moves for summary judgment, asking the Court to determine that it owns the rights to the three accounts as a matter of law because the three accounts bear the company's name; have content that is associated with its business; and were

---

[10] Grace Greene, Comment, *Instagram Lookalikes and Celebrity Influencers: Rethinking the Right to Publicity in the Social Media Age*, 168 U. PA. L. Rev. Online 153, 155 (2020).

[11] Werner Geyser, *The State of Influencer Marketing 2023: Benchmark Report* (Feb. 2023).

intended to generate revenues for the company. Mr. Owoc, of course, opposes the relief, asserting he owns the rights to the accounts.

Unfortunately, given the rise of influencer marketing, the existing test for determining ownership of the rights to social media accounts is outdated. Perhaps it is time for Congress or state legislatures to adopt a statutory framework to regulate social media, including determination of ownership rights. But that has not happened yet.[12] Until it does, the Court must fashion a standard that will allow it to fairly resolve this dispute.[13]

---

[12] Nor has Congress or the states regulated the use of artificial intelligence, another area where the evolution of technology has outpaced the law, and regulation is needed to mitigate its risks. Matt O'Brien, *ChatGPT Chief Says Artificial Intelligence Should be Regulated by a US or Global Agency*, Associated Press, May 16, 2023, https://apnews.com/article/chatgpt-openai-ceo-sam-altman-congress-73ff96c6571f38ad5fd68b3072722790 ("The head of the artificial intelligence company that makes ChatGPT told Congress . . . that government intervention will be critical to mitigating the risks of increasingly powerful AI systems."). In preparing the introduction for this Memorandum Opinion, the Court prompted ChatGPT to prepare an essay about the evolution of social media and its impact on creating personas and marketing products. Along with the essay it prepared, ChatGPT included the following disclosure: "As an AI language model, I do not have access to the sources used for this essay as it was generated based on the knowledge stored in my database." It went on to say, however, that it "could provide some general sources related to the topic of social media and its impact on creating personas and marketing products." It listed five sources in all. As it turns out, none of the five seem to exist. For some of the sources, the author is a real person; for other sources, the journal is real. But all five of the citations seem made up, which the Court would not have known without having conducted its own research. The Court discarded the information entirely and did its own research the old-fashioned way. Well, not quite old fashioned; it's not like the Court used actual books or anything. But this is an important cautionary tale. Reliance on AI in its present development is fraught with ethical dangers.

[13] Perhaps owing the numerous ways in which property disputes arise in bankruptcy, bankruptcy courts are often tasked with deciding novel issues of property law. *See, e.g.,* Tom Hals & Dietrich Knauth, *U.S. Court Weighs Novel Issue of Crypto Ownership in Bankruptcy*, Reuters, Dec. 7, 2022, https://www.reuters.com/technology/us-court-weighs-novel-issue-crypto-ownership-bankruptcy-2022-12-07/ ("A U.S. judge this week is considering for the first time the question of who owns bitcoin and other tokens in frozen accounts at a bankrupt digital asset exchange in a case that could shape customer protections in the cryptocurrency industry.").

I. **Undisputed Facts**[14]

Thirty years ago, John "Jack" Owoc—a self-professed avid fitness trainer, designer and producer of fitness supplements, weightlifter, motivational speaker, and writer—founded Vital Pharmaceuticals.[15] Until he was terminated in March 2023, Mr. Owoc served as the company's Chief Executive Officer and Chief Science Officer.[16] His wife, Megan, also terminated in March 2023, started with the company in 2010 and served as its Senior Vice President of Marketing.[17]

A. <u>Vital targets customers through social media</u>.

Vital has become a pioneer in the performance energy drink industry. The company has brought numerous products to market, including VPX Redline energy drink; Meltdown 1 Keto drink, Quash, and Vooz.[18] The company's flagship product, though, is Bang energy drink, which is one of the top selling energy drinks in the United States. Over the years, the company has generated more than $6 billion in retail sales.[19]

---

[14] For purposes of ruling on Vital's Motion for Summary Judgment, the Court takes as true all uncontested factual allegations asserted by the parties.

[15] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶¶ 1, 4.

[16] *Id.* ¶ 2.

[17] *Decl. of Megan E. Owoc*, Adv. Doc. 42, ¶ 2.

[18] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶ 5.

[19] *Id.* ¶ 4.

Vital attributes much of the company's "success" to its strategic use of nontraditional marketing channels—namely, social media.[20] Although an arbitrator determined that Vital's social media marketing campaign was predicated on improper use of the "Bang" brand name, which resulted in Vital being found liable for breach of contract and trademark infringement,[21] the parties do not dispute the undeniable significance of social media as foundational to Vital's marketing efforts.

In all, Vital has more than 50 social media accounts—including more than twenty Instagram accounts; eight TikTok accounts; five Twitter accounts; and twenty Facebook accounts—it uses to promote its products and drive sales (the "Company Accounts").[22] All the Company Accounts have "bang" or "bangenergy" in the name.[23]

B.    While employed by Vital, Mr. and Mrs. Owoc created the CEO Accounts bearing the company's "Bang" brand name.

The parties dispute the ownership of the rights to three social media accounts that have been used to market Vital's products:

---

[20] *Pls.' Compl.*, Adv. Doc. 1, ¶ 1; *Defs.' Answer*, Doc. 52, ¶ 1; *Decl. of John DiDonato*, Adv. Doc. 21, ¶¶ 5, 13.

[21] *Vital Pharmaceuticals, Inc. v. JHO Intellectual Props., LLC, et al.*, Adv. No. 23-01031-PDR, Adv. Doc. 3-2 at 36, 130 − 31 (finding that Vital's use of the "Bang" brand name breached a 2010 agreement with Orange Bang, Inc. and constituted trademark infringement and ordering Vital to pay $175 million in damages (plus a 5% continuing royalty to avoid an injunction enjoining future use of the "Bang" mark)).

[22] *Decl. of John C. DiDonato*, Adv. Doc. 21, ¶¶ 5, 13; *Decl. of John H. Owoc*, Adv. Doc. 41, ¶ 20.

[23] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶ 20. The Company Instagram accounts include: @bangenergy; @banghardseltzer; @bang.fuelteam; @bang_merch; @bangenergysweepstakes; @bangenergy.careers; @banenergyaustralia; @bangenergy.germany; @bangenery.finland; @bang.chile; @bangenergy.abcislands; @bangenergy.denmark; @bangenergynorway; @bangenergy.costarica; @bangenergy.bolivia; @bangenergy.sweden; @bangenergy.colombia; @bangenergy.southafrica; @bangenergy.france; @bangenergy.switzerland; and @bangenergy.eu. The Company Twitter accounts include: BANGenergy. The Company TikTok accounts include: @bangenergy; @bang.fuelteam.

- an Instagram account with the handle @bangenergy.ceo ("CEO Instagram Account");

- a TikTok account with the handle @bangenergy.ceo ("CEO TikTok Account"); and

- a Twitter account with the handle @BangEnergyCEO ("CEO Twitter Account").

These accounts have been referred to as the "CEO Accounts."

While working for Vital's marketing department, Mrs. Owoc created the CEO Twitter and CEO Instagram accounts,[24] and she, along with Mr. Owoc, directed Vital employees to create the CEO TikTok account.[25] Although there is a dispute whether the Owocs signed or are bound by Vital's employee handbook,[26] it provides that all "inventions," which includes all ideas and potential marketing, are considered "work made for hire" belonging to Vital.[27]

Together, the Owocs devised the names[28] for the CEO Accounts.[29] Like the Company Accounts, the CEO Accounts have "bangenergy" in the names. According to the Owocs, use of "bangenergyceo" in the names was intended to be a double entendre

---

[24] *Decl. of Megan E. Owoc*, Adv. Doc. 42, ¶ 14.

[25] *Id.* ¶ 15.

[26] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶¶ 10, 40; *Decl. of Megan E. Owoc*, Adv. Doc. 42, ¶¶ 9, 31.

[27] *Decl. of John DiDonato*, Adv. Doc. 21-10, Ex. J.

[28] In the social media context, there seems to be as many types of "names" as there are social media platforms. Each platform has a "username." But a Twitter user's "username" is synonymous with their "handle." And, in addition to a "username," Instagram users often refer to a "displayed name." Here, the Court's use of "name" is intended to encompass all the various types of social media "names."

[29] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶ 13; *Decl. of Megan E. Owoc*, Adv. Doc. 42, ¶ 11.

referring to Mr. Owoc's position as CEO as well as his persona as an "explosive, high-intensity, unstoppable leader."[30]

C.   <u>Mr. Owoc maintained the CEO Account passwords, but Vital employees had access to the accounts and posted content to them</u>.

Although Mr. Owoc maintained the passwords for the CEO Accounts, he shared them with Vital employees.[31] Vital employees created and posted content to the CEO Accounts.[32] Mr. Owoc testified during a deposition in a previous case that he did not have to approve the company-created marketing content that was posted to the CEO Accounts.[33]

D.   <u>The CEO Accounts have been used to market Vital's products and to a lesser extent post Owoc personal content</u>.

Over the years, Mr. Owoc has occasionally posted purely personal content to the CEO Accounts.[34] For example, he has used the CEO Accounts to wish others a

---

[30] *Decl. of John H. Owoc*, Adv. Doc. 41, ¶ 12.

[31] *Id.* ¶¶ 17 – 19.

[32] *Decl. of John DiDonato*, Adv. Doc. 21-3, Ex. C, p. 85, l. 21 – p. 86, l. 20.

[33] *Id.* at Ex. C, p. 85, l. 21 – p. 88, ll. 10 – 14.

[34] In opposition to Vital's summary judgment motion, the Owocs submitted screenshots of 284 recent social media posts. *Decl. of John H. Owoc*, Adv. Doc. No. 41, Exs. 1 – 3. Vital contends that the "vast majority" of the more than 6,400 posts to the CEO Accounts "promote [Vital's] product and business." *Pls.' Mtn. for Summ. J.*, Adv. Doc. 20, ¶ 8. The Owocs counter that 59% of the recent CEO Instagram Accounts posts, 55% of the recent CEO TikTok Account posts, and 82% of the recent CEO Twitter Account posts are "clearly personal and reflective of the Jack Owoc persona." *Defs.' Resp. to Pls.' Mtn. for Summ. J.*, Adv. Doc. 40, at 4. In order to analyze the use of the accounts objectively, the Court carefully reviewed the screenshots of each of the 284 social media posts, and then classified those posts into the following categories: posts that are purely or explicitly promotional in nature because they contained nothing other than an advertisement for Vital's products or apparel; posts that are implicitly promotional in nature because they contained images of Bang products, Bang apparel, or the Bang logo or contained a hashtag referencing Bang (e.g., "#bangenergy"); posts that are subtle marketing of Vital's products because they emphasized aspects of Mr. Owoc's persona in a way that was virtually indistinguishable from Vital's marketing strategy (e.g., posts that contained workout or nutritional

Happy Thanksgiving, Merry Christmas, and Happy New Year; to wish Mrs. Owoc a Happy Anniversary, Happy Valentine's Day, and Happy Wife Appreciation Day; to wish one of his daughters a Happy Birthday; to post a video of him playing the piano with one of his daughters; and to post a video of the birth of one of his children and the photo of a newborn child.[35] But those posts make up less than 10% (7.04% to be precise) of the content on the CEO Accounts offered as evidence to the Court.

The record is clear, however, that the CEO Accounts have predominately been used to market Vital products. They contain links to the company's website. The CEO Instagram Account is identified on the label of the Bang Energy drink can:[36]



---

advice consistent with the asserted attributes of the Bang energy drink); and purely "personal" posts (e.g., posts commemorating birthdays, anniversaries, holidays, etc.).

[35] *Decl. of John H. Owoc*, Adv. Doc. No. 41, Ex. 1 at 24, 32, 33, 74 – 76, 94, 95, 98, 101; Ex. 2 at 103, 114, 128, 132, 155, 169.

[36] *Decl. of John C. DiDonato*, Adv. Doc. 21, ¶ 6.

And, of the 284 recent social media posts that the Owocs introduced, 95 (33.5%) are pure marketing posts promoting Bang Energy[37] and another 111 (39.6%) are implicit marketing posts that include a Bang hashtag or images of Bang products, Bang apparel, or the Bang logo:[38]

*Pure Promotional Posts*







*Implicit Marketing*




---

[37] *Decl. of John H. Owoc*, Adv. Doc. 41, Exs. 1 – 3. A post was considered purely or explicitly "promotional" if it contained nothing other than an advertisement for a Bang (or other Vital) product. Much of the content in the explicitly or purely promotional posts appears to have been created by Vital's marketing department.

[38] *Id.*

 

Put another way, 206 of the 284 social media posts (nearly 75%) explicitly or implicitly market Bang products.[39]

Of the remaining posts to the CEO Accounts, roughly 15% are a form of subtle marketing in that they emphasize aspects of Mr. Owoc's persona in a way that is virtually indistinguishable from Vital's marketing strategy (e.g., posts that contain workout or nutritional advice consistent with the asserted attributes of the Bang energy drink):

 

 

---

[39] *Id.*

The remaining posts (less than 10%) are purely "personal" wishing others a Happy Thanksgiving or Merry Christmas or his wife a Happy Anniversary and the like:







E.    <u>Vital seeks turnover of the CEO Accounts</u>.

Six months ago, Vital (and its affiliates) filed for chapter 11 bankruptcy. Three months ago, on March 9, 2023, Vital's board of directors fired the Owocs and demanded they return all company property.[40] Vital was able to secure most of its social media accounts.[41] But the Owocs refused to turn over the passwords to the CEO Accounts.[42]

---

[40] *Decl. of John C. DiDonato*, Adv. Doc. 21, ¶¶ 8 – 9.

[41] *Id.* ¶¶ 10 – 11.

[42] *Id.* ¶¶ 10 – 11.

So Vital filed this adversary proceeding[43]—and moved for summary judgment[44]—seeking (1) a declaration that the rights to the CEO Accounts are property of the estate; and (2) turnover of the CEO Accounts.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact" and that the "movant is entitled to judgment as a matter of law."[45] When the movant has carried its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."[46] "The fact that the record contains anything at all in support of the nonmovant's position is not dispositive; a 'genuine' dispute requires that the evidence is such that a reasonable jury could find for the nonmovant."[47] And while the Court must draw all reasonable inferences in favor of the nonmovant, "an inference based on speculation and conjecture is not reasonable."[48]

---

[43] *Pls.' Compl.*, Adv. Doc. No. 1.

[44] *Pls.' Mtn. for Summ. J.*, Adv. Doc. 20.

[45] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[46] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)).

[47] *Hammet v. Pauling Cnty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986)).

[48] *Id.* (quoting *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013)).

### III.    Analysis

Relying primarily on *In re CTLI, LLC*,[49] Vital argues that social media accounts are property of the estate "when the content of the accounts is associated with the debtor's business and use of the accounts is 'clearly to generate revenues for the company.'"[50] Here, Vital argues, there is no genuine dispute of material fact that the CEO Accounts are associated with Vital's business (the names for each of the CEO Accounts include Vital's brand name, "bangenergy") and that the CEO Accounts were used to promote Vital's products.

The Owocs, however, argue that the facts of this case are distinguishable from those in *CTLI*.[51] In particular, they argue that Mr. Owoc has used the CEO Accounts to cultivate his colorful, public persona, which the Owocs contend is distinct from Vital and has personal value.[52] The Owocs also argue that summary judgment is premature.

For the reasons that follow, the Court disagrees that *CTLI*'s test for determining ownership of the rights to social media accounts remains the appropriate standard. Even so, the Court concludes that (1) there is no genuine dispute of material fact that Vital owns the rights to the CEO Accounts; and (2) summary judgment is not premature.

---

[49] *In re CTLI, LLC*, 528 B.R. 359, 367 – 74 (Bankr. S.D. Tex. 2015).

[50] *Pls.' Mtn. for Summ. J.*, Adv. Doc. 20, ¶¶ 29 – 33 (quoting *In re CTLI*, 528 B.R. 359, 368 (Bankr. S.D. Tex. 2015)).

[51] *Defs.' Resp. to Pls.' Mtn. for Summ. J.*, Adv. Doc. 40, at 2 – 4, 6 – 8.

[52] *Id.*

A.     <u>Vital is entitled to judgment as a matter of law because the record evidence is indisputable the CEO Accounts were pervasively used to market Vital and its products.</u>

Although social media has been around for decades, how the court determines whether social media accounts are property of a debtor's bankruptcy estate under Bankruptcy Code § 541 is a question few courts have examined.[53] In fact, the only court that has decided the issue is the United States Bankruptcy Court for the Southern District of Texas eight years ago in *CTLI*.

1.     <u>The standard for determining ownership of rights to social media accounts must move beyond *CTLI* given the evolution of social media.</u>

In *CTLI*, the debtor operated a gun store and shooting range under the trade name "Tactical Firearms." The bankruptcy court had to decide whether a Facebook page in the name of "Tactical Firearms" and a Twitter account with the handle "@tacticalfirearm" belonged to the debtor or its majority owner, Jeremy Alcede. The bankruptcy court concluded the Facebook page and Twitter account belonged to the debtor and were therefore property of the estate.[54]

According to the court in *CTLI*, creating a Facebook page and Twitter account handle using the name of the business raised a presumption that the social media

---

[53] *In re CTLI, LLC*, 528 B.R. 359, 378 (Bankr. S.D. Tex. 2015) ("This Court recognizes that the landscape of social media is yet mostly uncharted in bankruptcy."); *JLM Couture, Inc. v. Gutman*, 2023 WL 2503432, at *9 (S.D.N.Y. Mar. 14, 2023) ("The issue of ownership of a social media account is novel, and few courts have examined the question.").

[54] *In re CTLI, LLC*, 528 B.R. at 366 – 67.

accounts belonged to the debtor.[55] That presumption, in the court's view, was buttressed by the following facts:

- the Facebook page linked to the debtor's website;

- Alcede used the Facebook page to post status updates on the debtor's behalf;

- Alcede admitted he used the Facebook page to promote the debtor's business;

- "many" of Alcede's posts were "expressly business-related";

- Alcede granted a company employee access to post status updates using one of the company's marketing tools;

- Alcede shared his personal Facebook login with a vendor so it could post status updates promoting the company's products, which "was clearly to generate revenues for the company"; and

- the Twitter account described the debtor's business.[56]

In *CTLI*, the court rejected Alcede's argument that his "personal" use of the social media accounts made them his.[57] Among other reasons, the court rejected Alcede's distinction between "personal" and "business" posts, concluding that the "very nature of social media dictates that its best use for business is somewhat more subtle than other forms of marketing."[58] The court observed that a social media post advertising that Alcede was at a gun show was the "perfect example of this kind of subtle marketing" because it "most assuredly served to develop Mr. Alcede's

---

[55] *Id.* at 367 – 68.

[56] *Id.* at 368, 372.

[57] *Id.* at 368 – 72.

[58] *Id.* at 371.

17

reputation as being a well-informed, connected insider in the gun-buying community, a reputation that would attract consumers to the business of Tactical Firearms."[59] Thus, the court concluded that evidence of Alcede's "personal" posts on social media was "utterly insufficient to overcome the presumption" that the social media accounts belonged to the debtor.[60]

Although other (non-bankruptcy) courts have followed *CTLI*'s framework for determining ownership of the rights to social media accounts,[61] this Court declines to do so. *CTLI*, which was decided eight years ago (an eternity given the explosive growth and evolving nature of the use of social media), predates the emergence of the social media influencer, among other changes in use. While *CTLI* may have been correctly decided on its facts at the time, this Court concludes its framework is ill-suited for determining ownership of the rights to all types of social media accounts as the environment has evolved.

Noticeably absent from the *CTLI* framework is consideration of agreements that may establish ownership of the rights to a social media account. As the court acknowledges in *CTLI*, whether a social media account is property of the estate is determined by state law.[62] Although neither party here argued which state's law applies, Vital is headquartered in Florida and filed this case in Florida. The Court

---

[59] *Id.* at 371.

[60] *Id.* at 368.

[61] *See, e.g., Int'l Brotherhood of Teamsters Local 651 v. Philbeck*, 464 F. Supp. 3d 863, 871 – 72 (E.D. Ky. 2020); *JLM Couture, Inc. v. Gutman*, 2023 WL 2503432, at * 9 – 13 (S.D.N.Y. Mar. 14, 2023).

[62] *In re CTLI*, 528 B.R. at 366 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)).

therefore presumes Florida law governs. Florida law does not have a statutory scheme governing ownership of digital assets, such as social media accounts, like it does for (among other things) real property and motor vehicles.

Under state law, though, property interests or rights can be documented in or evidenced by a contract.[63] For instance, the terms of service for a social media account might provide which of the disputing parties owns the rights to the account or its content. And it is increasingly common today for employers to have a social media policy, or an employee handbook, that specifies who owns the rights to a social media account created by an employee while working for the employer. Indeed, a social media platform's terms of service and an employee handbook or social media policy may be the best evidence of who owns the rights to a social media account in the absence of any other clear ownership documentation to the contrary.

To the extent the *CTLI* framework creates a presumption that an account bearing the name of a company belongs to the company, given the rise of the social media influencer and associated notion of a social media persona, that framework gives too much weight to the name. To be sure, the name may be relevant for determining who owns the account rights, but the name should not create a *presumption* of ownership.

The *CTLI* framework also fails to account for the countless social media influencers who cultivate a persona to market products. In *CTLI*, the court rightfully

---

[63] *Moser v. Barron Chase Secs., Inc.*, 783 So. 2d 231, 236 n.5 (Fla. 2001) (explaining that, for procedural due process purposes, "property interest[s] may be created by statute, ordinance or contract").

noted that the "very nature of social media dictates that its best use for business is somewhat more subtle than other forms of marketing."[64] Indeed. But, as applied to social media accounts as they have evolved since *CTLI* was decided, the standard is too narrow when it suggests that any "personal" posts that cultivate an individual's reputation are really "business" in nature—and therefore cannot overcome the presumption that the account rights are owned by the company—if the reputation being cultivated could serve a business purpose.[65]

The court in *CTLI* appropriately recognizes that a Facebook page of a celebrity or public figure might implicate a "persona":

> The Facebook Page or Profile of a celebrity or other public figure is a different type of property, related to the interest known as a persona. A persona is "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others."[66]

But the framework it creates for determining ownership of the rights to social media accounts does not provide a mechanism for ensuring that the persona of a social media influencer remains their property.

To the contrary, by concluding that "personal" social media posts that increase a person's reputation in a way that attracts consumers to a business are really "business" in nature, the *CTLI* framework appears to tilt the scales in favor of a social media account potentially belonging to a company whose products a social media

---

[64] *In re CTLI*, 528 B.R. at 371.

[65] *Id.* at 368.

[66] *Id.* at 367 (quoting *Brown v. Ames*, 201 F.3d 654, 658 (5th Cir. 2000)).

influencer markets. This is insufficient with respect to, for example, any social media influencer's account that promotes more than one company's product. In fact, in that scenario, the social media influencer's account is, arguably, itself the business, and that business is owned by the social media influencer—not the companies whose products the influencer promotes.

2. <u>The test for determining ownership of the rights to social media accounts should focus on the existence of a documented property interest, control over access, and use.</u>

The Court holds that to determine ownership of the rights to a social media account, courts may employ the following framework:

(1) **Documented Property Interest**. An agreement that documents or evidences a property interest in the account rights creates a rebuttable presumption that the party with the documented property interest owns the account rights.

(2) **Control Over Access**. A rebuttable presumption created by a "documented property interest" can be overcome by evidence of control over access to the account, including evidence that (i) one party has the exclusive power (other than the social media platform) to access the social media account; (ii) the same party has the "exclusive power" to prevent others (other than the social media platform) from accessing the social media account; and (iii) the social media account enables that party to readily identify itself in any way as having that power. Evidence of "control over access," however, will rarely overcome a rebuttable presumption created by a documented property interest. But, if neither party has a "documented property interest," then conclusive evidence of "control over access" creates its own rebuttable presumption of ownership.

(3) **Use.** If a party has both a documented property interest and control over access, that ends the

inquiry, and that party owns the rights. However, a rebuttable presumption of ownership arising because of a "documented property interest" or "control over access" (but not both), can be overcome by evidence of "use" of the social media account. Use of the account includes the name used for the account; whether the account is used to market or promote one or more products; whether the account is used to promote a persona; how a determination of ownership of the account rights would change the account's use; and whether any required changes to the account's use would fundamentally change the nature of the account.

First, the court should consider any agreements that document or evidence a property interest in the rights to the social media account. Typical evidence would include a social media platform's account-opening document and terms of service. It may also include an employer's social media policy or employee handbook specifying who owns the rights to a social media account created by an employee while working for the employer. This type of evidence will create a presumption of ownership of the rights to a social media account; however, because Congress intended to exclude from the estate property in which a debtor held "bare legal title,"[67] for bankruptcy purposes the presumption of ownership is rebuttable (and it may be rebuttable in other legal contexts as well).

The advantage of this first consideration is twofold: First, these documents are generally objective evidence of ownership and consistent with foundational legal principles of property rights. Contrast that type of evidence with, say, use of an

---

[67] *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n.8 (1983) ("The legislative history [of Bankruptcy Code § 541] indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title.").

account (i.e., whether posts are "personal" or "business"), which is, by its nature, a somewhat subjective inquiry. Second, by looking to ownership documents, such as a company's social media policy or employee handbook, owners, employers, and employees will be incentivized to document ownership of the rights to social media accounts, promoting much-needed objectivity and predictability.

Second, courts should consider "control over access" when a party seeks to overcome—or when there is inconclusive evidence creating—a rebuttable presumption of ownership. "Control" is a concept borrowed from proposed UCC Article 12. In July 2022, the Uniform Law Commission adopted Article 12 to deal with "digital assets." Under Article 12, digital assets are referred to as "Controllable Electronic Records."[68] As the name suggests, a Controllable Electronic Record is a "record stored in an electronic medium that can be subjected to control under Section 12-105."[69] In order for a person to have "control" over an electronic record, the person must have (1) the "power to avail itself substantially" of all the electronic record's benefits; (2) the "exclusive power" to prevent others from doing so; and (3) the electronic record "enables the person readily to identify itself in any way . . . as having [those] powers."[70]

---

[68] UCC § 12-102(a)(1) (Am. L. Inst. & Unif. L. Comm'n, Proposed Official Draft 2022).

[69] *Id.*

[70] *Id.* § 12-105.

Although the comments to proposed Article 12 make clear that a social media page constitutes an "electronic record,"[71] the drafters nonetheless concluded a "so-called 'page' on a social media platform" is not a Controllable Electronic Record for Article 12 purposes because social media platforms "typically involve licensing arrangements with users that do not permit the users (or anyone) to acquire the exclusive powers contemplated by the definition of 'control' in Section 12-105."[72] While true, the concept of—and Article 12's proposed test for—control as a significant factor is useful in the context of determining ownership of the rights to social media accounts as between parties other than the social media platform itself.

Use of Article 12's "control" test for that purpose is not at odds with any licensing agreements social media platforms may have with users because this Court assumes, in the first instance, that the social media platform's terms of service are essentially controlling. And at bottom, this Court is faced with deciding an actual dispute between real parties in an area where the law has not kept pace with the evolving technology, and Article 12 was intended to adapt the law to "emerging technologies," including "technologies that have yet to be developed, or even imagined."[73]

---

[71] *Id.* § 12-102 cmt. 2 ("An electronic record would include, for example, music stored on compact disks, email messages, digital photos, personal and other information stored on a social media platform, and all types of databases stored on in an electronic medium.").

[72] *Id.*

[73] Uniform Law Commission, *Uniform Commercial Code and Emerging Technologies* Committee Meeting Draft at 2 – 3, (July 9-15, 2021).

Thus, when considering "control," the Court will consider (1) whether any person (other than the social media platform) has the exclusive power to access the social media account; (2) whether that person has the exclusive power to prevent others (other than the social media platform) from accessing the social media account; and (3) whether that person is able to identify themself as having the exclusive power to access the account and to exclude others (other than the social media platform) from doing so. Evidence establishing "control over access" to a social media account may include evidence that a person exclusively maintains the password for the account and has the final say over the content that may be posted to the account.

If a party has both a "documented property interest" in and "control over access" to a social media account, then that ends the inquiry: the account rights are owned by that party. Where one party is only able to show a "documented property interest," but the opposing party can show evidence of "control over access," that evidence can, but will rarely, overcome the rebuttable presumption of ownership created by a "documented property interest."

Third, a rebuttable presumption of ownership arising because of a "documented property interest" in or "control over access" to the account (but not both), can be overcome by evidence of "use" of the social media account. Because use of social media is multifaceted and ever-changing, there is no—nor should there be any—fixed set of "use" factors. Evidence that a court might consider includes:

- **Creation of the account**: Who created the account? Was the account created by an employee? If it was created by an employee, did the employee use company resources? If so, that would be evidence the account rights belong to the company. If the account

was created by an individual outside their capacity as an employee, that would be evidence the account rights belong to the individual.

- **Account name**: Does the account name include the name of a business or individual? If so, that would be evidence the account rights belong to that business or individual. If the account name includes the name of a business and refers to an individual, or vice versa, the court should look to other factors.

- **Use of the account for the exclusive purpose of marketing or promoting a single business or product**: If an account is used exclusively to market or promote a single business or product (or multiple products owned by the same company), that would be evidence that the account's exclusive purpose is to market or promote the single business or product and that the account rights are owned by the company whose business or product is being promoted. The court should consider whether the account includes a description of the company's business or links to the company's products, social media accounts, or website and whether the account name is listed on the company's products.

- **Use of the account to promote multiple businesses or products:** If an account is used to promote multiple businesses or products, that is evidence that the account rights are not intended to be owned by any one of those businesses but instead may be owned by a person or company who exclusively posts content on the account. This factor would also consider whether the business or products promoted on the account are owned by a single parent company or affiliates of one another. If not, then a court should consider whether there is any understanding or indication that the account rights were intended to be jointly owned.

- **Use of the account by a person to promote multiple businesses or products but whose promotion largely depends on the persona of that person and for which that person is compensated for such promotion.** If an account is used by a person to promote multiple businesses or products, promotion of the businesses or products largely depends on the persona of that person, and the person is compensated for such promotion, that is evidence that the account is itself the business and the rights are owned by that person (i.e., a social media influencer).

- **Use of the account to promote a single business or product and to post personal content**: If an account is used to promote a

single business or product (or multiple products owned by the same company), as well as to post personal content, the account rights may be owned by either the promoted business or the person posting personal content. To determine who owns the rights to such an account, a court must consider additional factors, including whether the personal content posted on the account is subtle marketing of the promoted business or product.

- **Use of the account to cultivate or promote a persona**: If the account includes an individual's name, image, or likeness, and shares or communicates the individual's thoughts or views, does the individual have a persona? A persona is "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others."[74] If the individual has a persona, is content on the account consistent with (or does the content cultivate) the persona? If so, that is evidence that the account rights may be owned by the person whose persona is included, but that evidence must be considered in the context of the use of the account to promote a business or product, including whether the person's thoughts and views relate to the attributes of the product (even if the product is not specifically mentioned); or by comparison whether the content on the account consisting of the individual's name, image, or likeness or the individual's thoughts or views is pervasive.

- **Whether changes to the account would be required based on a determination of ownership**: If the court determined that either the company or individual owned the rights to the account, would changes to the account be required? For example, if the court determined that an individual owned the account rights, would the individual have to remove the company's name, logo, or trademarks from the account? If the court determined the company owned the account rights, would the company have to remove the individual's name, image, or likeness? If these changes were required to be made, are they more easily capable of being made in favor of one party or the other?

- **Whether any required changes to the account would fundamentally change the nature of the account**: If the changes

---

[74] *In re CTLI, LLC*, 528 B.R. 359, 367 (Bankr. S.D. Tex. 2015) (quoting *Brown v. Ames*, 201 F.3d 654, 658 (5th Cir. 2000)); *see also persona,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/persona (defining persona as "the personality that a person (such as an actor or politician) projects in public").

were made, would they alter the followers' expectations of whose account they were following? If an individual had to remove all a company's trademarks from the account and could not use those trademarks going forward, would followers believe they were still following the same account? If the answer is "no," that would be evidence the account rights belong to the company. Conversely, if a company had to remove the name, image, or likeness of an individual or could not use the individual's name, image, or likeness going forward, would followers believe they were still following the same account? If the answer is "no," that would be evidence the account rights belong to the individual.

3.  <u>Neither party was able to establish a "documented property interest" or "control over access," but the record evidence is indisputable that the CEO Accounts were pervasively used for marketing Vital products.</u>

As the moving party, Vital has the burden of demonstrating there is no genuine dispute of material fact that it owns the rights to the CEO Accounts.

a.  <u>Documented Property Interest</u>.

Neither party has offered sufficient evidence to establish a "documented property interest" in the CEO Accounts. For example, neither party offers the terms of service or account opening documents as establishing a documented property interest in their favor. Vital does provide an excerpt of its handbook, which provides that "all inventions" created by Vital employees belong to Vital. It is not clear, however, that "inventions" includes social media accounts (the handbook does not specifically include them in the definition of "invention" even though the handbook discusses use of social media) or that the Owocs ever signed or are bound by the handbook.

b.    <u>Control Over Access</u>.

Neither party has established (i) the exclusive power to access the CEO Accounts; or (ii) the "exclusive power" to prevent others from doing so; or that (iii) the CEO Accounts enable them to readily identify themselves in any way as having that power. The Owocs' evidence of "control over access" was, at best, conflicting: Mr. Owoc testified in his affidavit that he maintained the passwords,[75] but he conceded that he shared them with Vital employees. Vital employees created content for—and posted that content to—the CEO Accounts, and in a deposition in a prior case, Mr. Owoc testified that Vital employees could post content without his approval. Thus, based on the record evidence, it appears both parties had access to the CEO Accounts.

c.    <u>Use</u>.

Unable to establish a "documented property interest" in or "control over access" to the CEO Accounts, the parties primarily rely on the use of the accounts to establish ownership. Drawing all inferences in the Owocs' favor, the record evidence establishes that Mrs. Owoc created the CEO Instagram and CEO Twitter Accounts, but she did so while working for Vital. Vital employees created the CEO TikTok Account but seemingly upon the instruction of the Owocs, again while they were working there.

---

[75] There is some reason to doubt Mr. Owoc's claim that he maintained control of the password to the CEO TikTok Account. As part of a stipulated temporary restraining order, Mr. Owoc agreed to turn over the CEO Account passwords to the Court by March 16, 2023. Adv. Docs. 9, 10. Mr. Owoc was unable to do so, however, because he could not locate the CEO TikTok Account password. Nor could he reset it because two-factor authentication had been enabled on the account, and Mr. Owoc did not know where the e-mails confirming the password change request were being sent. Adv. Docs. 83, 93, 99, 111, 140. Mr. Owoc had to subpoena TikTok to find out where the two-factor authentication e-mails were being sent. Adv. Doc. 140. It turns out they were being sent to a Vital company e-mail account.

Each of the names for the CEO Accounts includes "bangenergy," but they also include "ceo," which position had been held until recently by Mr. Owoc. Vital continues, though, to have a CEO position.

Vital has established that use of the CEO Accounts for marketing Bang energy products is pervasive. Of the 284 recent social media posts that the Owocs introduced, 95 (33.5%) are pure marketing posts promoting Bang energy drink,[76] and another 111 posts (39.6%) include a Bang hashtag or images of Bang products, Bang apparel, or the Bang logo.[77] Put another way, 206 of the 284 social media posts (nearly 75%) explicitly or implicitly market Bang products. And another 15% (bringing the total to 90%) are subtle marketing of Bang products in that they emphasize aspects of Mr. Owoc's persona in a way that is virtually indistinguishable from Vital's marketing strategy (e.g., posts that contain workout or nutritional advice consistent with the asserted attributes of the Bang energy drink). In addition, the CEO Accounts contain links to Vital's website; and the CEO Instagram Account is identified on the label of the Bang energy drink can. This evidence is more than enough to satisfy Vital's burden as the moving party.

Thus, the burden shifted to the Owocs to demonstrate a genuine dispute of material fact by providing enough record evidence a reasonable jury could rely on to find in their favor. The Owocs' evidence centers around the alleged use of the CEO Accounts to cultivate his persona. For summary judgment purposes, Vital has

---

[76] *Decl. of John H. Owoc*, Adv. Doc. 41, Exs. 1 – 3.

[77] *Id.*

stipulated that Mr. Owoc has a persona. According to Mr. Owoc, that persona is as "an avid fitness trainer, designer and producer of fitness supplements, weight-lifter, motivational speaker and writer."[78] While it is true that some of the posts include a motivational quote or workout or nutritional advice, the great majority of these posts also include strategically placed Bang branded products. They are therefore the type of subtle marketing identified in *CTLI*, which favors a determination Vital owns the rights to the CEO Accounts. This is especially evident given that less than 10% of the posts to the CEO Accounts are purely personal in nature. And the Owocs failed to introduce any record evidence that Mr. Owoc is a social media influencer, that he uses his persona to market any non-Vital products, or that he is paid to do so.

Ultimately, this Court must decide whether the fact that Mr. Owoc has a persona, that some of the posts are consistent with that persona, and that 10% of the posts are of a purely personal nature, is enough for a reasonable jury to conclude that the Owocs own the right to the CEO Accounts. Given the indisputable record evidence that use of social media has always been the centerpiece of Vital's marketing strategy; the accounts were created by people who were working for Vital at the time; the CEO Accounts' names include Vital's brand name; the posts that could be viewed as cultivating Mr. Owoc's persona are subtle marketing of Vital's brand and products; and promotion of Vital's brand and products is pervasive throughout the posts (90% of the posts are explicit, implicit, or subtle marketing), the Court concludes a reasonable jury could not find for the Owocs. Therefore, there is no genuine dispute

---

[78] *Defs.' Resp. to Pls.' Mtn. for Summ. J.*, Adv. Doc. 40, at 2, ¶ 2.

as to any material fact, and Vital is entitled to judgment as a matter of law that it owns the rights to the CEO Accounts.

     B.    <u>Summary judgment is not premature.</u>

The Owocs complain summary judgment is premature because they have not had a chance to conduct discovery.[79] This Court held a summary judgment hearing six weeks after this proceeding was filed. During that time, the Owocs had to respond to Vital's request for injunctive relief. The parties have not yet exchanged initial disclosures or conferred on a scheduling order. Under those circumstances, the Owocs say it is "axiomatic" that they have not had a "meaningful opportunity" to conduct discovery.[80]

As the court in *In re Saks* explained, "Rule 56(d) provides a mechanism for protecting a party against summary judgment when the party has not had a reasonable opportunity to take discovery."[81] Under Rule 56(d), this Court may defer consideration of or deny summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a summary judgment motion.[82]

---

[79] *Defs.' Resp. to Pls.' Mtn. for Summ. J.*, Adv. Doc. 40, at 11 – 13.

[80] *Id.* at 12.

[81] *Crockett v. Saks (In re Crockett)*, 2022 WL 18273866, at *10 (Bankr. M.D. Fla. Dec. 30, 2022) (citing Fed. R. Civ. P. 56(d)).

[82] Fed. R. Civ. P. 56(d).

"[V]ague assertions that additional discovery will produce needed, but unspecified facts" are not sufficient.[83] Instead, a party seeking to delay summary judgment "must specifically demonstrate 'how postponement of a ruling on the motion will enable [them], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'"[84]

Here, the Owocs have failed to demonstrate that they were denied a meaningful opportunity to conduct discovery. To be sure, six weeks is not a lot of time. But the Owocs claim they need copies of the employee handbook from Vital and contracts with the various social media platforms. All the Owocs had to do to obtain those documents was serve one document production request on Vital and subpoenas on the social media platforms. This is not a situation where the Owocs served discovery requests but have not yet received the responsive documents. The Owocs have not served any discovery requests at all.

The Owocs' request to defer consideration of Vital's summary judgment motion fails for a more fundamental reason: they do not "specifically demonstrate" how postponement will allow them to rebut Vital's showing. In their summary judgment response, the Owocs allege that discovery will allow them to (1) investigate the foundation for a statement in Vital's supporting affidavit that the "vast majority" of the 6,400 posts on the CEO Accounts promote Vital's business and products; and (2)

---

[83] *Smedley v. Deutsche Bank Trust Co. Am.*, 676 F. App'x 860, 862 (11th Cir. 2017) (quoting *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990)).

[84] *Fla. Power & Light Co.*, 893 F.2d at 1316 (quoting *Wallace v. Brownell Pontiac–GMC Co.*, 703 F.2d 525, 527 (11th Cir.1983)).

review Vital's employee handbook in its entirety.[85] Yet, the Court did not rely on these statements in Vital's supporting affidavit or the employee handbook in concluding that Vital has demonstrated there is no genuine dispute of material facts that it owns the rights to the CEO Accounts. Because the Owocs have failed to specifically demonstrate how postponing summary judgment will allow them to rebut Vital's showing, the Court concludes summary judgment is not premature.

## IV.    Conclusion

Given the overwhelming evidence in favor of Vital, the Court determines there is no genuine dispute of material fact and that Vital owns the rights to the CEO Accounts as a matter of law. By separate order, the Court will enter final judgment in favor of Vital on Counts I and II of its adversary complaint declaring that the rights to the CEO Accounts are property of the estate and ordering the Owocs to turn over the CEO Accounts to Vital. This Memorandum Opinion is a non-final order. The Court's ruling will become final upon entry of the final judgment.

###

Copies to:
All parties in interest.

---

[85] *Defs.' Resp. to Pls.' Mtn. for Summ. J.*, Adv. Doc. 40, at 11 – 13.